# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

ON MOTION FOR REHEARING

NO. 03-07-00037-CV

**Mark D. Bogar, M.D., Appellant**

**v.**

**Dolores G. Esparza, Individually and as Administrator of the Estate of Katherine G. Guerrero; Deceased; Fernando Guerrero; Sofia G. Butschy; Gilberto Guerrero; Antonio Guerrero; Rosie G. Garza; Benito Guerrero; Josey G. Selvera; and Frances G. Faz, Appellees**

FROM PROBATE COURT NO. 1 OF TRAVIS COUNTY, NO. 82,917-A, HONORABLE GUY S. HERMAN, JUDGE PRESIDING

**O P I N I O N**

We withdraw our opinion, dissenting opinion and judgment dated June 28, 2007 and substitute the following in its stead. We overrule the Appellees' Motion for Rehearing.

We again address issues arising from the expert report requirements of section 74.351 of the civil practice and remedies code. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351 (West Supp. 2006). Appellant Mark D. Bogar, M. D. appeals the probate court's denial of his motion to dismiss appellees' health care liability claims under section 74.351(b) for failure to serve an expert report. Their appeal requires us to consider (1) whether we have subject-matter jurisdiction to consider it; (2) whether appellees served the required expert report; and, if not, (3) the appropriate

appellate remedy.  We conclude that we have jurisdiction over Dr. Bogar's interlocutory appeal and that the controlling law and "four corners" of appellees' report leave us no alternative but to reverse and render judgment dismissing appellees' claim and awarding attorney's fees and costs. *See id*. § 74.351(b).  In their motion for rehearing and en banc reconsideration, appellees have urged that our application of section 74.351 violates due process and due course of law.  We disagree, for reasons we will explain herein.  We will remand to the probate court to determine the amount of attorney's fees to which Dr. Bogar is entitled.

## BACKGROUND

Appellees sued Dr. Bogar and Healthsouth on May 1, 2006, alleging negligence in connection with medical care provided to Katherine R. Guerrero by Dr. Bogar and the "agents, servants, employees, representatives, and staff" of Healthsouth Rehabilitation Hospital of Austin between December 28, 2004, and January 12, 2005, when Ms. Guerrero died.  Appellees alleged that following surgery, Ms. Guerrero was placed under the care of Dr. Bogar and Healthsouth and, in the course of her rehabilitative treatment, was given a fatal overdose of pharmaceutical products. Appellees pleaded that an autopsy report from the Travis County Medical Examiner concluded that Ms. Guerrero "died as a result of an overdose of oxycodone and propoxyphene."

On or around June 6, 2006, Appellees served on Dr. Bogar and Healthsouth an expert report prepared by Dr. Jesse Adame that purported to comply with the requirement of subsection 74.351(a).  *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(a) ("In a health care liability claim, a claimant shall, not later than the 120th day after the date the claim was filed, serve on each party or the party's attorney one or more expert reports . . . for each physician or health care provider against

whom a liability claim is asserted."). Both defendants timely filed objections to the sufficiency of Dr. Adame's report. *See id.* ("Each defendant physician or health care provider whose conduct is implicated in a report must file and serve any objection to the sufficiency of the report not later than the 21st day after the date it was served, failing which all objections are waived."). Each defendant contended that Dr. Adame's report failed to satisfy the statutory definition of an "expert report" by failing to provide a fair summary of the expert's opinions regarding applicable standards of care, the manner in which the care rendered by each defendant failed to meet the standards, and the causal relationship between such failure and Ms. Guerrero's death. *See id.* § 74.351(a), (*l*), (r)(6). Further, Dr. Bogar urged that Dr. Adame, a pathologist, had failed to demonstrate that he was an "expert" qualified to render opinions concerning the standards of care applicable to Dr. Bogar, a physical medicine rehabilitation physician. *See id.* § 74.351(r)(5), § 74.401 (West 2005).

Subsequently, after appellees' 120-day deadline for serving their expert reports expired, *see id.* § 74.351(a), Dr. Bogar and Healthsouth filed a joint motion seeking dismissal with prejudice, attorney's fees and costs for failure to file an expert report complying with section 74.351. *See id.* § 74.351(b). Dr. Bogar later filed an amended motion to dismiss adding his earlier challenge to Dr. Adame's qualifications. On January 10, 2007, the probate court denied the dismissal motions.

Both Dr. Bogar and Healthsouth timely filed notices of interlocutory appeal. In the interim, Healthsouth settled with appellees. We accordingly address only the appellate issues presented by Dr. Bogar.

## ANALYSIS

3

In a single issue, Dr. Bogar argues that the probate court abused its discretion in denying his motion to dismiss and request for attorney's fees and costs. In addition to disputing the merits of this contention, appellees have filed a motion to dismiss Dr. Bogar's interlocutory appeal for want of jurisdiction, contending that no statute authorizes him to appeal the order he seeks to challenge.

**Jurisdiction**

Appellate courts generally have subject-matter jurisdiction only over appeals from final judgments and have jurisdiction over appeals of interlocutory orders only when that authority is explicitly granted by statute. *Academy of Oriental Med., L.L.C. v. Andra*, 173 S.W.3d 184, 185 (Tex. App.—Austin 2005, no pet.) (citing *Stary v. DeBord*, 967 S.W.2d 352, 352-53 (Tex. 1998)). Section 51.014(a) of the civil practice and remedies code authorizes an interlocutory appeal from two types of orders regarding expert reports under chapter 74. First, an interlocutory appeal may be taken from an order that "denies all or part of the relief sought by a motion under Section 74.351(b), except that an appeal may not be taken from an order granting an extension under Section 74.351(c)." Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(9) (West Supp. 2006). Second, an interlocutory appeal may be taken from an order that "grants relief sought by a motion under Section 74.351(*l*)." *Id.* § 51.014(a)(10).

Appellees assert that the order from which Dr. Bogar seeks to appeal is neither of these. They suggest that "the relief sought by a motion under Section 74.351(b)" is available only where a claimant has failed to timely file an instrument purporting to be an "expert report" by the 120-day deadline of subsection (a), not when a purported "expert report" is timely filed but is found

4

to be inadequate. *See id.* § 74.351(b) ("If . . . an expert report has not been served within the period specified by Subsection (a) . . . ."). Here, appellees maintain, there is no dispute that "the expert report of Dr. Adame was served within the required period of time." Appellees further assert that challenges to the adequacy or sufficiency of expert reports, as contrasted with their absence or timeliness, are governed exclusively by section 74.351(*l*). Section 74.351(*l*) states that "[a] court shall grant a motion challenging the adequacy of an expert report only if it appears to the court, after hearing, that the report does not represent an objective good faith effort to comply with the definition of an expert report in Subsection (r)(6)." *Id.* § 74.351(*l*). Because Dr. Bogar's motion, in appellees' view, is "a motion under section 74.351(*l*)," they assert that his right of interlocutory appeal is controlled by section 51.014(a)(10) rather than (a)(9), and no appeal is available from the probate court's order denying him relief. *See id.* § 51.014(a)(10) (permitting appeal from an order that "*grants* relief sought by a motion under Section 74.351(*l*)") (emphasis added). They equate this case to *Academy of Oriental Medicine*, *L.L.C. v. Andra*, where we held that an order denying a motion challenging the sufficiency of an expert report was governed by section 74.351(*l*) rather than section 74.351(b) and that "[b]ecause this appeal challenges an order that is neither an order denying the relief sought by a motion under § 74.351(b) nor one granting relief sought by a motion under § 74.351(*l*), we lack jurisdiction to hear it." 173 S.W.3d at 186-89. We disagree with appellees' views of section 74.351 and *Andra*.

Under section 74.351(b), as the supreme court has recently explained, a plaintiff may fail to "serve" an "expert report" within the period specified by Subsection (a) not only by failing to serve any expert report within that deadline (an "absent report"), but also by failing to provide a

5

report within the deadline that satisfies the statutory requirements for "expert reports" (a "deficient report"). *See Ogletree v. Matthews*, No. 05-0502, ___ S.W.3d ___, ___, 2007 Tex. LEXIS 1028, at *6-8 & n.2, (Tex. Nov. 30, 2007); *Austin Heart P.A. v. Webb*, 228 S.W.3d 276, 284 (Tex. App.—Austin 2007, no pet.); *Apodaca v. Russo*, 228 S.W.3d 252, 257-58, (Tex. App.—Austin 2007, no pet.); *cf. Walker v. Gutierrez*, 111 S.W.3d 56, 61 (Tex. 2003) (dismissal under former article 4590i warranted for "failure to comply" with report deadline by either failure to file or failure to file adequate report). This conclusion is apparent from the text and structure of section 74.351. Subsection (a) requires the claimant to file one or more "expert reports" not later than the 120th day after the date the original petition was filed, and subsection (b) mandates sanctions "[i]f, as to a defendant physician or health care provider, an expert report has not been served within the period specified by Subsection (a)." "Expert report" is defined within section 74.351 as: "a written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." Tex. Civ. Prac. & Rem. Code Ann. § 74.351(r)(6); *see id.* § 74.351(r)(5) (definition of "expert"). Thus, if the report does not comply with subsection (r)'s "expert report" definition, it does not satisfy the claimant's requirement under subsection (a) and exposes the claimant to potential sanctions under (b), including dismissal.

Subsection (c), however, provides that "[i]f an expert report *has not been served within the period specified by Subsection (a) because elements of the report are found deficient*," the trial court is afforded discretion to grant a single 30-day extension "in order to cure the

6

deficiency." Tex. Civ. Prac. & Rem. Code Ann. § 74.351(c) (emphases added); *See Ogletree*, ___ S.W.3d at___, 2007 Tex. LEXIS 1028, at *7-8 ("the Legislature recognized that not all initial timely served reports would satisfy each of the statutory criteria. As a result, the [2003] amendments explicitly give trial courts discretion [in subsection (c)] to grant a thirty-day extension so that parties may, where possible, cure deficient reports. . . . In this important respect, a deficient report differs from an absent report."). Conversely, "[i]f no report is served within the 120-day deadline provided by 74.351(a)"—i.e., an 'absent report'—the Legislature denied trial courts the discretion to deny motions to dismiss or grant extensions." *Ogletree*, ___ S.W.3d at___, 2007 Tex. LEXIS 1028, at *6; *see also id.* at *7 & n.2 ("section 74.351's language is somewhat confusing, as the statute uses the phrase "has not been served" to refer both to deficient and absent reports.").

The supreme court also reiterated the concept that a report served within the 120-day deadline that fails entirely to implicate the conduct of a defendant is not merely deficient, but is in effect an absent report or no report as to that defendant. *See id.* at *6-8 (citing with approval *Garcia v. Marichalar*, 185 S.W.3d 70, 73 (Tex. App.—San Antonio 2005, no pet.) for the principle that an "expert report" that mentioned other providers but not Garcia was in effect no report as to Garcia and concluding that an extension was, therefore, improper); *cf. Austin Heart*, 228 S.W.3d at 284 (holding that timely report that "plainly discusses the conduct of the physician in question" but was deficient in failing to explicitly link the physician to the report's stated opinions regarding standard of care and causation was potentially curable and should be remanded for consideration of whether a subsection (c) extension should be granted).

7

Recently, the Texas Supreme Court has laid to rest any question as to whether the availability of interlocutory review of an order denying relief under section 74.351(b) differs depending on whether the motion's grounds relate to (1) the absence of any timely-served expert report, (2) a timely expert report that is nonetheless not "served" on a defendant because it is deficient as to one or more statutory criteria, or (3) a timely expert report that is effectively "no report" as to a defendant because it fails to implicate that defendant's conduct. The supreme court concluded, as we did on original submission, that it does not. *See Lewis v. Funderburk*, No. 06-0518, ___ S.W.3d ___, ___, 2008 Tex. LEXIS ____, at *6-7 (Tex. Apr. 11, 2008). A potential limitation on this right to appeal exists, however, where a timely expert report implicates a defendant's conduct: the trial court, in its discretion, may grant an extension under section 74.351(c), in which case the order denying the motion under section 74.351(b) is not appealable. Tex. Civ. Prac. & Rem. Code Ann. §§ 51.014(a)(9), 74.351(b)-(c); *see Ogletree*, ___ S.W.3d at ___, 2007 Tex. LEXIS 1028, at *6-8 ("If no report is served within the 120 day deadline provided by 74.351(a), the Legislature denied trial courts the discretion to dismiss or grant extensions, and a trial court's refusal to dismiss may be immediately appealed. . . . [But] even when a report is deemed not served because it is deficient, the trial court retains discretion to grant a thirty-day extension, and the Legislature explicitly stated that such orders are not appealable. . . . [I]f a deficient report is served and the trial court grants a thirty-day extension, that decision—even if coupled with a denial of a motion to dismiss—is not subject to appellate review."). In other words, an order denying relief under subsection (b) is immediately appealable unless the trial court has discretion under subsection (c) to grant a 30-day extension and actually does so.

Here, Dr. Bogar filed objections to Dr. Adame's expert report within 21 days of service, *see* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(a), and a motion, after the 120-day deadline had expired, explicitly invoking subsection (b) and asserting that the probate court should dismiss appellees' claim against him with prejudice and award attorney's fees and costs for failure to file "a statutorily defined expert report" by the deadline. *See id.* § 74.351(b). The probate court denied that motion without granting an 30-day extension. *Id.* § 74.351(b), (c). That order "denies all or part of the relief sought by a motion under Section 74.351(b)," and we have subject-matter jurisdiction to adjudicate Dr. Bogar's appeal from that order. *Id.* § 51.014(a)(9); *see Lewis*, ___ S.W.3d at ___, 2008 Tex. LEXIS at *____; *Ogletree*, ___ S.W.3d at ___, 2007 Tex. LEXIS 1028, at *6-8; *Andra*, 173 S.W.3d at 186-87. We accordingly deny appellees' motion to dismiss Dr. Bogar's appeal.

**Dr. Adame's report**

We turn now to Dr. Bogar's issue. Dr. Bogar asserts that the probate court abused its discretion in denying his section 74.351(b) motion because appellees failed to "serve" him with an expert report. Specifically, Dr. Bogar urges that (1) Dr. Adame's report did not represent a good faith effort to comply with the statutory requirements for "expert reports" and, in fact, constituted no report as to him; and (2) Dr. Adame, as a pathologist, was not qualified as an "expert" to evaluate Dr. Bogar's performance as a rehabilitative medicine specialist. We need not reach the latter contention because we agree that Dr. Adame's report was deficient with regard to the statutory requirements for expert reports.

As noted above, the "expert report" or reports that a health care liability claimant must serve under section 74.351(a) must provide "a fair summary of the expert's opinion as of the

9

date of the report regarding the applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." Tex. Civ. Prac. & Rem. Code Ann. § 74.351(r)(6). A trial court, again, must grant a motion challenging the adequacy of a report only if the report "does not represent an objective good faith effort to comply" with this definition of "expert report." *Id.* § 74.351(*l*). To constitute a "good faith effort," the report must provide enough information to fulfill two purposes: (1) it must inform the defendant of the specific conduct the plaintiff has called into question; and (2) it must provide a basis for the trial court to conclude that the claims have merit. *Austin Heart*, 228 S.W.3d at 279 (citing *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002); *American Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 879 (Tex. 2001)). Although a report need not marshal all of a claimant's proof, it must include the expert's opinion on each of the elements identified in section 74.351. *Id.* (citing *Palacios*, 46 S.W.3d at 878). It is not enough for the report merely to state the expert's conclusions about the statutory elements. *Id.* (citing *Palacios*, 46 S.W.3d at 379). "Rather, the expert must explain the basis of his statements to link his conclusions to the facts." *Id.* (quoting *Bowie Mem'l*, 79 S.W.3d at 52) (quoting *Earle v. Ratliff*, 998 S.W.2d 882, 890 (Tex. 1999)).

Importantly, because the statute dictates what is required in the report, the only information relevant to determining whether a report complies with the statute is that within "the four corners" of the report. *Id.* (citing *Palacios*, 46 S.W.3d at 878). This requirement "precludes a court from filling gaps in a report by drawing inferences or guessing as to what the expert likely meant or intended." *Id.* (citing *Bowie Mem'l*, 79 S.W.3d at 53).

10

We review a trial court's ruling on a section 74.351(b) motion under an abuse of discretion standard. *Palacios*, 46 S.W.3d at 877-78. A trial court abuses its discretion when it acts in an arbitrary or unreasonable manner or acts without reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241 (Tex. 1985). A clear failure by the trial court to analyze or apply the law correctly also constitutes an abuse of discretion. *Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992).

The document prepared by Dr. Adame recites his qualifications and concludes that "I am qualified based on my education, training and experience to offer an expert opinion regarding the cause and mechanism of death of Mrs. Katherine Ramirez Guerrero. As a pathologist, I am familiar with the standard of care required of physicians not to prescribe drugs either alone or in combination that will cause a fatal overdose." "Such conduct," Dr. Adame adds, "falls below the standard of care required of physicians."

Dr. Adame then lists the medical records and other materials he had reviewed, and summarizes Ms. Guerrero's medical history. Dr. Adame notes that Ms. Guerrero was 76 years of age, and had a "past medical history of hyperlipidemia, osteoarthritis, poorly controlled hypertension, and chronic dizziness." He recounts that Ms. Guerrero had complained of left hip pain following a December 25, 2004 fall and had been "admitted to Seton/Brackenridge Hospital after is was determined that she had a nondisplaced fracture of the left femur," but "[i]t was also determined at that time, that no surgical intervention was needed." Adame then states:

> Her medical problems and rehabilitation were managed by HealthSouth Rehabilitation Hospital of Austin. She was transferred to that facility on December 28, 2004. She was placed on a Duragesic patch at 25 mcg on December 29, 2004. It was increased to 50 mcg on December 30, 2004 because of continued significant pain. She was also given her usual home medications including Doxepin, Norvasc,

Zescril, Tenormin, and Imdur. Because of significant drowsiness with the Duragesic patch, her dose was reduced back to 25 mcg. She was also given Protonix for gastrointestinal prophylaxis. Despite a fairly stable hospital course, her pain increased. On January 7, 2005, after her records were reviewed and she was cleared for surgery, she was taken to the operating room at Seton/Brackenridge Hospital for open reduction and internal fixation of her left femur. Her surgery went well and she was transferred back to HealthSouth Rehabilitation Hospital of Austin on January 8, 2005. She resumed her medical regimen along with physical and occupational therapy. Her pain persisted and she was taken off of Duragesic patch post surgery. OxyContin was added to her therapy, initially at 10 mg and later increased to 20 mg. She had bouts of constipation and loose stool which was medically managed. On January 12, 2005 at 9:34 p.m. she experienced cardiopulmonary arrest. Despite cardiopulmonary resuscitation until 10:13 p.m., she was pronounced dead.

Dr. Adame then summarizes the "significant findings" of the autopsy report from the Travis County Medical Examiner's Office, including "the conclusions . . . that Mrs. Guerrero died as a result of an overdose of oxycodone and propoxyphene."

Adame then states his "opinions and conclusions." He begins: "I concur with the autopsy conclusions." He observes that the medical examiners "performed a complete autopsy with toxocological analysis of blood, vitreous humor, and urine," and references certain autopsy findings. Dr. Adame describes the composition and effect of oxycodone and propoxyphene as various dosing levels, including the levels indicative of toxicity and death. Drawing on these observations, he states the following:

Mrs. Guerrero had postmortem blood oxycodone concentration of 0.25 mg/L. This level and the clinical findings of nausea and labored breathing (noted in nursing notes shortly before her death) indicates that the oxycodone was inducing respiratory depression.

. . . . .

Mrs. Guerrero had postmortem blood propoxyphene levels of 1.0 mg/L. This concentration of propoxyphene and the clinical findings of nausea, labored breathing, and cardiac arrest (noted in nursing notes shortly before her death) indicates that the

12

propoxyphene was inducing respiratory depression, cardiac arrhythmia, and circulatory collapse and subsequent death. In addition, the respiratory depression was exacerbated by the high concentrations of oxycodone (see above).

Dr. Adame then concludes:

In summary, Mrs. Guerrero had toxic levels of oxycodone along with lethal levels of propoxyphene which caused her demise. The mechanism of death was respiratory depression, cardiac arrhythmia, and circulatory collapse. Additionally, autopsy examination failed to demonstrate an anatomic cause of death.

All of my opinions above are predicated upon a reasonable medical probability.

Dr. Adame's report fails to comply with the requirements of section 74.351. Most notably, it does not identify in any way the person or persons whose conduct is the subject of any of his opinions regarding standard of care, causation, and death. We have held that where a defendant is not identified at least in some manner within the "four corners" of the report, the report is, for that reason alone, deficient as to that defendant because it would require the reader to infer or make an educated guess as to whose actions the expert is complaining. *Austin Heart*, 228 S.W.3d at 281; *Apodaca*, 228 S.W.3d at 257-58; *see Marichalar*, 198 S.W.3d at 255.[1] The report likewise fails to describe the standard of care potentially applicable to Dr. Bogar, other than a broad reference to "the standard of care required of physicians not to prescribe drugs either alone or in combination that will cause a fatal overdose," which he never applies or analyzes in light of specific facts and

[1] As we emphasized in *Austin Heart*—and as suggested by the supreme court in *Ogletree*, as we discuss below—this is not a "magic words" test. There may be a number of ways that a defendant may be referenced within the four corners a report so as to comply with the legislature's mandate that the report "provide[] a fair summary as of the date of the report regarding applicable standards of care, the manner in which the care *rendered by the physician or health care provider* failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." Tex. Civ. Prac. & Rem. Code Ann. § 74.351(r)(6) (emphasis added).

13

circumstances. Further, Dr. Adame never describes how Dr. Bogar might have breached a standard of care or link such a breach to Ms. Guerrero's death. *See Jernigan v. Langley*, 195 S.W.3d 91, 93-94 (Tex. 2006) (affirming dismissal under former article 4590i where report made only "passing mention" of defendant physician and failed to state how he breached the standard of care or how his alleged breach caused injury); *see also Palacios*, 46 S.W.3d at 879-80 (conclusory statement that "precautions to prevent [patient's] fall were not properly utilized" did not sufficiently apprise physician whether the expert believed that the standard of care required him "to have monitored [the patient] more closely, restrained him more securely, or done something else entirely"). In essence, Dr. Adame's report is a second autopsy report, opining about the cause of Ms. Guerrero's death without explaining who caused it or how. *See Sherman v. Austin State Hosp.*, No. 03-05-00296-CV, 2006 Tex. App. LEXIS 1115, at *30—4 (Tex. App.–Austin 2006, pet. denied)(mem.op.)("A report finding only the cause of death does not satisfy the statutory requirements."), *cert. denied*, 2007 U.S. LEXIS 352 (U.S. Jan. 8, 2007). We hold that the probate court abused its discretion in denying Dr. Bogar's motion for sanctions under section 74.351(b). We sustain Dr. Bogar's issue.

**Remedy**

In the probate court, appellees requested that, in the event Dr. Adame's report was found deficient, the court grant them a discretionary 30-day extension under section 74.351(c) to enable them to cure any deficiencies in the report. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(c). Because the probate court held that Dr. Adame's report "is sufficient in meeting the requirements of . . . Ch. 74," it did not reach the extension issue. As earlier noted, trial courts have discretion to grant extensions under subsection (c) where "an expert report has not been served within the period specified by Subsection (a) because elements of the report are found deficient."

14

*See id.* § 74.351(c). Conversely, where an expert report has not been "served" as to a defendant within the 120-day period because no report is timely served or a report fails to implicate the defendant's conduct, the trial court has no discretion but to dismiss upon a section 74.351(b) motion. *Ogletree,* ___ S.W.3d at ___, 2007 Tex. LEXIS 1028, at *6 (citing *Marichalar*, 185 S.W.3d at 856). In *Austin Heart*, we discerned from this statutory scheme legislative intent that in "at least some situations where a timely report is deficient [but not entirely absent or no report] . . . the trial court should consider whether the deficiency is such that it warrants allowing a cure period." 228 S.W.3d at 284. Because we concluded that the report at issue in the case was deficient as opposed to no report regarding the physician defendant, we deduced that subsection (c) required us to remand to the trial court, in lieu of rendering a judgment of dismissal and sanctions, to afford the court the opportunity to exercise its discretion whether to grant a 30-day extension. *Id.* Appellees urge that the same appellate relief is appropriate here if we reverse the probate court's order denying Dr. Bogar's section 74.351(b) motion.

Our disposition of this question turns on whether the flaws in Dr. Adame's report render it merely deficient with respect to the statutory criteria or, as Dr. Bogar argues, render the report no report as to him. If we hold the former, we would, under *Austin Heart*, remand to afford the trial court the opportunity to exercise its discretion whether to grant a 30-day extension under section 74.351(c) to cure the deficiency. If we conclude that Dr. Adame provided no report as to Dr. Bogar, we would instead render the judgment the trial court should have rendered—dismissal. *Austin Heart*, 228 S.W.3d at 284; *see Ogletree*, ___ S.W.3d at ___, 2007 Tex. LEXIS 1028, at *8-9 ("If no report is served within the 120 day deadline provided by 74.351(a), the Legislature denied trial courts the discretion to dismiss or grant extensions . . . .").

15

We accordingly compare Dr. Adame's report to those in other cases under section 74.351 in which the distinction between a timely report constituting no report versus a merely deficient report has been addressed.

In *Marichalar*, the plaintiff asserted claims for medical negligence relating to a sponge that was left in her body during abdominal surgery. She named as defendants three physicians—Prieto, Garcia-Arecha, and Garcia—two nurses, and the hospital. Marichalar timely served an expert report prepared by an obstetrician-gynecologist, Dr. Miller, in which he stated that Prieto, the surgeon, and Garcia-Arecha, the assistant surgeon, deviated from the standard of care because they allowed "the lap sponges not to be counted correctly and then noted in the chart that they were correct" and then "failing to diagnose and remove the laparotomy sponge in a timely manner." However, neither Dr. Miller nor a nurse expert implicated Dr. Garcia, as opposed to the other providers, in their respective reports. *See Garcia v. Marichalar*, 198 S.W.3d 250, 253 (Tex. App.—San Antonio 2006, no pet.). The San Antonio Court of Appeals concluded that "with regard to Garcia, there was no timely served expert report," requiring the trial court to dismiss Marichalar's claims against Garcia and depriving it of any discretion to grant a 30-day extension. *Marichalar*, 185 S.W.3d at 73; *Marichalar*, 198 S.W.3d at 252.

In *Austin Heart*, the expert, Dr. Cororve, repeatedly referred in the report's background section to defendant physician Dr. Kessler by name and discussed various acts by him and other identified and unidentified caregivers. However, Dr. Cororve did not explicitly link Dr. Kessler's acts to Cororve's subsequent opinions regarding the applicable standard of care, how it was breached, and how the breach caused injury. *Austin Heart*, 228 S.W.3d at 280-81. We concluded that the report was deficient because "it requires the reader to infer or make an educated

16

guess that Dr. Cororve [the expert] is identifying Dr. Kessler as the physician who breached the standard of care and caused injury" and that "[t]here is nothing *in the report* that links Dr. Kessler to Dr. Cororve's opinions regarding the breach of the standard of care and causation any more than Dr. Rodgers or the other 'various physicians' references." *Id.* at 281. Although we emphasized that "a report's adequacy under section 74.351 does not depend on whether the expert uses any particular magic words such as 'the standard or care was breached *by Dr. Kessler*,'" we observed that "Dr. Cororve's report is silent as to whether a single physician, multiple physicians, or all physicians mentioned in the report failed to meet the standard of care and caused injury to Mr. Webb." *Id.* at 281-82. Nonetheless, we distinguished Dr. Cororve's deficient report from the "no report" found in *Marichalar*:

> Here, a timely report plainly discusses the conduct of the physician in question and the report discusses opinions on the standard of care and causation that could be linked to the conduct of the physician set out in the report, but simply are not. The report is not deficient because it does not relate to Dr. Kessler at all. It is deficient because the link between Dr. Kessler's conduct and the expert's conclusions is not expressly stated. The report in this case is, therefore, some report as to Dr. Kessler (among others), but it is not sufficient to meet all of the requirements of section 74.351. It is an example of what section 74.351(c) refers to as a report that "has not been served within the [120-day period for serving reports] because elements of the report are found deficient.

*Id.* at 284; *see also id.* at 285 (suggesting that "[i]f the expert is of the opinion that Dr. Kessler's conduct breached the standard of care and caused injury, he will not have to generate a new, previously nonexistent report. He will simply have to add the link between his already stated conclusions and the already referenced conduct of Dr. Kessler. Therefore, the circumstances here

are not similar to the situation where a plaintiff simply has missed the deadline for serving a report with respect to the conduct of a physician.").

More recently, the supreme court in *Ogletree,* although apparently endorsing the "no report" concept of *Marichalar, see Ogletree*, ___ S.W.3d at ___, 2007 Tex. LEXIS 1028, at *6 (citing *Marichalar* with approval), also indicated that the omission of a defendant's name would not categorically render a report "no report" as to that defendant. The plaintiffs alleged negligence by Dr. Jan Ogletree, a urologist, in performing a urinary catheterization procedure on John Burke Matthews in a manner causing him injuries and ultimate death. The plaintiff timely served the one-page expert report of Dr. Richard Karsh, which stated, in relevant part:

> In my opinion (but I would have to defer to a urologist on this) given the inability of the nursing staff to pass the Foley catheter into the bladder and the necessity for the urologist to utilize a stiff metallic "wire" to transverse the urethra, such manipulation and catherization should have been performed under fluoroscopic guidance. Had that been done the perforation might well have been avoided but certainly could have been diagnosed at the outset, with the likelihood of a smaller tear having resulted.
>
> If not recognized in a timely manner, such a tear could lead to long-term problems, including bladder (or, if a urethral tear, urethral) dysfunction, infection, etc. It is apparent that a cystogram was performed shortly after the catherization, although the exact timetable is unclear; nor do I have records to determine whether or not the response of the physician to the tear was appropriate. (Of course, those might be best reviewed by a urologist).

*Ogletree*, ___ S.W.3d at ___, 2007 Tex. LEXIS 1028, at *2-3. Dr. Ogletree complained that Dr. Karsh, as a radiologist, was not qualified to render opinions on a urologist's standard of care. Because of this defect, Ogletree asserted, no "expert report" was "served" within the 120-day deadline, the trial court had no discretion to grant a 30-day extension and its denial of his section 74.351(b) motion should therefore be immediately appealable. The supreme court, however,

18

characterized this type of complaint as a report being "deemed not served because it is deficient," and subject to a discretionary 30-day extension under section 74.351(c). *Id.* at *7-8. It held that "[b]ecause a report that *implicated Dr. Ogletree's conduct* was served and the trial court granted an extension, the court of appeals could not reach the merits of its motion to dismiss." *Id*. at *9 (emphasis added).

Although the supreme court did not squarely address the significance of Dr. Karsh's omission of Dr. Ogletree's name from his report, it characterized the report as "directed solely to Dr. Ogletree's care (although it did not mention him by name)," *id.* at *2, and "implicating" Dr. Ogletree's conduct. *Id.* at *9 ("a report that implicated Dr. Ogletree's conduct"). The supreme court's references to a report "implicating" a provider's conduct appears to allude to section 74.351(a)'s 21-day deadline by which "[e]ach defendant physician or health care provider *whose conduct is implicated in a report* must file and serve any objection to the sufficiency of the report." Tex. Civ. Prac. & Rem. Code Ann. § 74.351(a) (emphasis added). Elsewhere the court distinguishes between cases "where there is an absence of a report, rather than a report that implicated a provider's conduct but was somehow deficient." *Ogletree*, __ S.W.3d at ___, 2007 Tex. LEXIS 1028, at *7 n.2. These statements imply that a defendant provider's conduct can be "implicated" by a report even if the provider is not explicitly mentioned by name and that although such an omission might render the report deficient, it would not for that reason alone render the report "no report" as to the provider.[2]

---

[2] In *Apodaca v. Russo*, 228 S.W.3d 252, 255-58 (Tex. App.—Austin 2007, no pet.), this Court affirmed a trial court order dismissing a health care liability suit under section 74.351(b) and refusing to grant a 30-day extension under section 74.351(c). The lone defendant was Dr. Russo, a general surgeon, who was alleged to have acted negligently in failing to implement precautions

Turning to Dr. Adame's report, it is, as noted, essentially a second autopsy report, opining about the cause of Ms. Guerrero's death without explaining who caused it or how. There are only cursory references to the conduct of anyone connected to Ms. Guerrero's care. In the "History" section of his report, Dr. Adame notes that after her fall, Ms. Guerrero's "medical problems and rehabilitation were managed by HealthSouth Rehabilitation Hospital of Austin," where she was later "transferred back . . . on January 8, 2005 " following her hip surgery at Brackenridge. Adame then recounts:

> She resumed on her medical regimen along with physical and occupational therapy. Her pain persisted and she was taken off of Duragesic patch post surgery. OxyContin was added to her therapy, initially at 10 mg and later increased to 20 mg. She had bouts of constipation and loose stools which were medically managed. On January 12, 2005, at 9:34 p.m., she experienced cardiopulmonary arrest. Despite cardiopulmonary resuscitation until 10:13 p.m., she was pronounced dead.

In his "opinions and conclusions" regarding the cause of death, Dr. Adame does not elaborate on the specific conduct or persons to whom he attributes the overdose other than vaguely alluding to "clinical findings" of "nausea, labored breathing, and cardiac arrest" that, to him, confirmed that the

---

against pulmonary embolism or stroke. The report described various deviations from the standard of care, including failures to properly address deep venous thrombosis prevention or to insert an IVC filter, but did not identify Dr. Russo by name or otherwise. The panel observed that "[a[lthough appellant has sued only Dr. Russo, other doctors and health-care providers are implicated by the facts set forth in the report. The report references other providers as well as their conduct and refers to another doctor by name, but fails to mention Dr. Russo at all." *Id.* at 257. The panel found the report deficient *and no report*, reasoning that it did not "specifically identify the defendant and apply the statutory elements to that defendant," *id*. at 258, and "[i]f a report fails to address the defendant physician, it constitutes no report as to that defendant, and the trial court may not grant a 30-day extension." *Id.* at 257. We need not consider *Ogletree*'s implications for *Apodaca*'s analysis of the "no report" issue because it is dicta. *See Ogletree*, ___ S.W.3d at ___, 2007 Tex. LEXIS 1028, at *6-8 (emphasizing discretionary nature of 30-day extension when trial court finds expert report deficient).

20

amounts and combination of oxycodone and propoxyphene were inducing respiratory depression, cardiac arrhythmia, circulatory collapse, and subsequent death.

Although the distinction between "no report" and a deficient-but-potentially curable report can be elusive, we conclude that Dr. Adame's report is no report as to Dr. Bogar. Dr. Adame, again, never mentions Dr. Bogar in his report. Although that omission alone may not alone render the report "no report," the report entirely fails to implicate Dr. Bogar's conduct—if any person's conduct. The report is simply silent regarding how the overdose occurred and who, if anyone, was responsible for it. Dr. Adame does not identify any acts or omissions, by persons identified or unidentified, to which he attributes the overdose. *Cf. Ogletree*, ___ S.W.3d at ___, 2007 Tex. LEXIS 1028, at *2-4 (report opining that "the urologist" should have performed manipulation and catheterization under fluoroscopic guidance and attributing patient's injuries to same). Nor, even assuming Adame's passing references to Ms. Guerrero's "medical regimen" and receipt of oxycodone could implicate the conduct of any person, would his report implicate *Dr. Bogar's* conduct as opposed to unidentified agents of Healthsouth. *See Marichalar*, 185 S.W.3d at 73; *Marichalar*, 198 S.W.3d at 252. Dr. Adame cannot cure these omissions simply by "add[ing] the link between his already stated conclusions and the already referenced conduct" of Dr. Bogar. *See Austin Heart*, 228 S.W.3d at 285. There is nothing in the report regarding Dr. Bogar that could be linked to anything. Consequently, Dr. Adame could "cure" the deficiencies in his report only by "generat[ing] a new, previously nonexistent report" as to Dr. Bogar. *See id.* Such a remedy, as we have explained, is proscribed by section 74.351.[3]

---

[3] The dissent criticizes this holding, suggesting that we could remand to the probate court in the same manner as in *Austin Heart*, 228 S.W.3d at 285 (Patterson, J., dissenting). As the dissent

21

In their motion for rehearing and reconsideration en banc, appellees acknowledge that "[t]he report did not assign blame for the victim's harm to a specific physician or hospital employee by name" and is silent regarding "who exactly did what." They suggest that "Dr. Adame's report shows a fatal overdose of medications given to an inpatient in the hospital, a lapse with all the hallmarks of *res ipsa loquitur*" that "create[s] a powerful presumption that the overdoses were the result specifically of negligence by the treating physician of record." Even assuming *res ipsa loquitur* applied in this case, this evidentiary presumption would not create an exception to section 74.351's expert report requirement. The *Marichalar* court rejected a similar contention in a "sponge case"—surgeons left surgical sponges inside the plaintiff during abdominal surgery. The court explained:

> While section 74.201 allows for the application of res ipsa loquitur, we do not interpret it as an exception to section 74.351's expert report requirement. Res ipsa loquitur is an evidentiary rule. In contrast, section 74.351's expert report requirement establishes a threshold over which a claimant must proceed to continue a lawsuit; it does not establish a requirement for recovery. It may be that once discovery is complete and the case is tried, there is no need for expert testimony . . . . But the Legislature envisioned that discovery and the ultimate determination of what issues are submitted to the factfinder should not go forward unless at least one expert has examined the case and opined as to the applicable standard of care, that it was breached, and that there is a causal relationship between that failure to meet the standard of care and the injury, harm, or damages claimed. Thus, because res ipsa loquitur is an evidentiary rule while the expert report is a threshold requirement for

has acknowledged in *Austin Heart* and elsewhere, section 74.351 does not permit such a remedy where, as here, the report constitutes no report. *See Austin Heart*, 228 S.W.3d at 291 (Patterson, J., dissenting) ("[t]he difference between the two is strategically significant. If the report is 'no report,' then the trial court *must* dismiss the case with prejudice and has no discretion to grant a 30-day extension.") (emphasis in original); *Apodaca*, 228 S.W.3d at 257 ("If a report fails to address the defendant physician, it constitutes no report as to that defendant, and the trial court may not grant a 30-day extension.") (citing *Garcia v. Marichalar*, 185 S.W.3d 70, 74 (Tex. App.—San Antonio 2005, no pet.)).

22

bringing a lawsuit, we do not believe that the Legislature intended for section 74.201
to eliminate the procedural requirement of an expert report at the commencement of
litigation.

*See Marichalar*, 198 S.W.3d at 255-56. (internal citations and quotes omitted). We find this
analysis persuasive. Consequently, even if *res ipsa loquitur* applied to appellees' claims against
Dr. Bogar, it would not excuse their failure to serve him with an expert report.

**Constitutional issues**

In their motion for rehearing and for reconsideration *en banc*, appellees attribute
their noncompliance to chapter 74's limitations on discovery, urging that "the report could not
have [complied] without compulsory process, as the precise facts regarding which named
individuals administered each dose, failed to comprehend the danger or catch the error, or failed
to remedy its effects, were then and remain today in the sole possession of the defendants."
Section 74.351(s) provides:

> Until a claimant has served the expert report and curriculum vitae as required by
> Subsection (a), all discovery in a health care liability claim is stayed except for
> acquisition by the claimant of information, including medical or hospital records
> or other documents or tangible things, related to the patient's health care through:
>
> (1)    written discovery as defined in Rule 192.7, Texas Rules of Civil
> Procedure;
>
> (2)    depositions on written questions under Rule 200, Texas Rules of Civil
> Procedure; and
>
> (3)    discovery from nonparties under Rule 205, Texas Rules of Civil
> Procedure.

Tex. Civ. Prac. & Rem. Code Ann. § 74.351(s). "Notwithstanding any other provision of this section, after a claim is filed all claimants, collectively, may take not more than two depositions before the expert report is served as required by Subsection (a)." *Id.* § 74.351(u). These provisions thus bar oral depositions of parties and allow only two oral depositions of non-parties before the expert report is served. They also bar pre-suit depositions to investigate potential claims under rule 202. *In re Jorden*, No. 06-0369, 2008 Tex. LEXIS 228, *7-8 (Tex. Mar. 28, 2008).

Appellees urge that their inability to orally depose Dr. Bogar before serving their expert report creates "an intolerable procedural conundrum" or "catch-22" by preventing them from obtaining the very information they need to prepare a sufficient expert report.[4] This "conundrum," appellees assert, imposes an "impossible condition" on medical malpractice claimants' property rights in their causes of action that violates the due process clause of the fourteenth amendment to the United States Constitution and due course of law under article I, section 19 of the Texas Constitution. *See* U.S. Const. amend. XIV; Tex. Const. art. I, § 19.[5] Appellees acknowledge that "Texas courts construe Article I, Section 19, in line with the federal due process guarantees" and that "[s]tandards for Texas constitutional claims regarding access to the courts are the same under due process and open courts." *See University of Tex. Med. Sch. v. Than*, 901 S.W.2d 926, 929 (Tex.

---

[4] Appellees similarly suggest that this regime incentivizes medical malpractice defendants to "maintain[] silence until the expert report deadline [to] entirely defeat a valid claim that in any other tort case they would each work affirmatively to defect onto a co-defendant as early as possible."

[5] Dr. Bogar does not dispute that appellees preserved their constitutional arguments in the trial court.

1995); *Sax v. Votteler*, 648 S.W.2d 661, 664 (Tex. 1983).[6] Appellees stop short of "contend[ing] that the expert report requirement must be invalidated for all cases," but instead urge us to "construe Section 74.351 to avoid a constitutional problem" by either "declar[ing], for cases where medical negligence by one or more defendants is clear but where the plaintiff cannot allocate fault among them without discovery, that Section 74.351(s) does not stay the discovery necessary to obtain the fault allocation facts that would perfect the required expert report; or declar[ing] the expert report in such a case sufficient without those facts, since they are unnecessary to demonstrate at the threshold that the case has merit."[7]

We begin with the presumption that section 74.351 is constitutional. *Walker*, 111 S.W.3d at 66. Additionally, the party challenging the constitutionality of a statute bears the burden of establishing that the enactment fails to meet constitutional requirements. *Id.* With regard to restrictions on health care liability claims in particular, we are mindful of two general principles. First, "there are constitutional limitations upon the power of courts . . . to dismiss an action without affording a party the opportunity for a hearing on the merits of his [or her] cause." *Thoyakulathu v. Brennan*, 192 S.W.3d 849, 855 (Tex. App.—Texarkana 2006, no pet.) (*quoting Walker*, 111 S.W.3d at 66 (*quoting TransAmerican Nat. Gas Corp. v. Powell*, 811 S.W.2d 913, 917-18 (Tex. 1991))). Second, the filing of a frivolous lawsuit can be misconduct subject to sanction. *Id.* (citing *Palacios*, 46 S.W.3d at 878). "[O]ne purpose of the expert-report requirement is to deter

---

[6] However, as appellees further recognize, the open courts guarantee, *see* Tex. Const. art. I, § 13, is not directly implicated in this case because it applies only to common-law causes of action, not their statutory wrongful-death or survival claims.

[7] Appellees similarly urge us to "avoid a constitutional confrontation" by remanding the case to afford them the opportunity to amend their expert report.

25

frivolous claims." *Walker*, 111 S.W.3d at 66. "The Legislature has determined that failing to timely file an expert report, or filing a report that does not evidence a good-faith effort to comply with the definition of an expert report, means that the claim is either frivolous, or at best has been brought prematurely. This is exactly the type of conduct for which sanctions are appropriate." *Palacios*, 46 S.W.3d at 878. Consequently, the supreme court rejected a due-process challenge to former article 4590i's mandatory dismissal of health care liability claims for failure to comply with statutory requirements. *Walker*, 111 S.W.3d at 66 ("The Gutierrezes' failure to file an adequate report thus raised the presumption that their claims were frivolous, or at best, premature. . . . We do not believe the Constitution requires prior notice that the law is serious about a clearly stated consequence for failing to comply with its terms. The sanction imposed . . . was a direct result of their failure to file an expert report that complied with the statutory requirements. Consequently, dismissal was appropriate and did not violate the due process clause, even in the absence of a notice of noncompliance prior to the motion to dismiss."); *see Brennan*, 192 S.W.3d at 855-56 (applying *Walker* to section 74.351).

Turning to appellees' specific challenge, they have the burden of establishing that section 74.351's discovery limitations have in fact prevented them from satisfying the statute's expert-report requirements and pursuing their claim. *See McGlothlin v. Cullington*, 989 S.W.2d 449, 453 (Tex. App.—Austin 1999, pet. denied) (burden on claimant asserting open-courts violation is to provide sufficient evidence that the expert report requirement, and not her own inaction, actually functioned to keep her from pursuing her claim). Appellees suggest in their motion that they were forced to "prepare their report[] on medical records alone"and that these records were inadequate, but do not suggest they ever actually pursued the discovery permitted under section 74.351(s) beyond

26

serving requests for disclosures at some unspecified point in time.[8] Nor is there any evidence in the record to support such an assertion. We observe that section 74.351(s) and (u) authorize claimants to obtain discovery via not only requests for disclosure, but interrogatories, requests for production, requests for admissions, and depositions on written questions to parties (i.e., forms of discovery that could have been directed to Dr. Bogar); and rule 205 requests for production, depositions on written questions, and up to two oral depositions of non-parties.[9] The rules further provide mechanisms for enforcing compliance with discovery requests.[10] Appellees dismiss the significance of "[t]he limited written discovery that Section 74.351(a) nominally permits before service of the expert report," asserting that it is "widely understood not to extend beyond the medical records specifically mentioned in that subsection, and defense counsel in health care liability actions uniformly refuse any other written discovery." If that could be so, it is not because of anything the legislature actually provided in section 74.351, nor do appellees present evidence that any such application of section 74.351(s) in fact prevented them from obtaining any necessary discovery they had actually sought. *See Brennan,* 192 S.W.3d at 854 n.5 (rejecting similar due-process argument "premised on [claimant's] failure to receive discovery from another party" as "ignor[ing] the remedies available to him to enforce lawful discovery requests"); *see also Marichalar*, 198 S.W.3d at 254 n.1 (observing that "if the medical records are indeed conflicting" as to assistant surgeon's identity, as

---

[8] In a footnote in their motion, appellees complain that "Texas courts have never implemented the regime of preliminary disclosures provided in principle in Section 74.352; the plaintiffs had to request disclosures from the defendants, who responded – after the expert report was served – with little or nothing of substance."

[9] *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(s), (u); Tex. R. Civ. P. 192.7(a) (defining "written discovery"); *see generally* Tex. R. Civ. P. 194, 196-98, 200-01.

[10] *See* Tex. R. Civ. P. 215.

counsel had orally contended, "Marichalar could have propounded discovery to Dr. Garcia to discovery whether he was the assistant surgeon . . . [a]nd if Dr. Garcia failed to timely answer the discovery requests, Marichalar could have moved to compel his answers."). Like the *Brennan* court, "we can certainly imagine a due process deprivation to a health care liability claimant pinned between a firm expert report deadline and a hypothetical absence of discovery tools," but must similarly conclude that appellees have not carried their burden of demonstrating that they were denied due process by such a situation here. *Brennan*, 192 S.W.3d at 856 n.8; *see McGlothlin*, 989 S.W.2d at 453 (claimant's affidavit made "no mention of any actual attempt to obtain an expert report," in lieu of article 4590i bond requirement, "only some perceived financial barrier").

Appellees also question whether there is a rational relationship between chapter 74's expert-report requirement as applied here and the legislature's goal of discouraging frivolous lawsuits. *See Lucas v. United States*, 757 S.W.2d 687, 691 (Tex. 1988) (holding that it was "unreasonable and arbitrary for the legislature to conclude that arbitrary damage caps, applicable to all claimants no matter how seriously injured, will help assure a rational relationship between actual damages and the amounts awarded."). This argument is predicated upon appellees' view that the bare fact Ms. Guerrero died of a drug overdose while in the hospital "create[s] a powerful presumption that the overdoses were the result specifically of negligence by the treating physician of record," whom they assert was Dr. Bogar. We disagree that it is irrational, in light of the legislature's goal of curtailing frivolous health care liability claims, for it to require that appellees serve an expert report explaining why or how this outcome was actually caused by the conduct of *Dr. Bogar*, as opposed to some other person or health care provider. *See Walker*, 111 S.W.3d at 66 (explaining that the plaintiffs' failure to comply with the expert-report requirements "raised the

28

presumption that their claims were frivolous, or at best, premature" and dismissal did not violate due process); *Marichalar*, 198 S.W.3d at 254-55 ("Section 74.351(r)(6) requires that an expert report explain how the care *rendered by the physician* failed to meet the applicable standard of care and the causal relationship between that failure and the injury suffered by the claimant."); *see also Brennan*, 192 S.W.3d at 855-56 (applying *Walker* to reject as-applied challenge to expert-report requirement where claimant had attempted to serve report timely, but fax machine failed; "Section 74.351 need not provide an exception geared toward such misfortune in order to provide constitutionally adequate safeguards.").

We accordingly reject appellees contentions that our application of section 74.351 on the present record violates due process or due course of law.

**CONCLUSION**

As the Texas Supreme Court recently acknowledged, the requirements of section 74.351(b) "can lead to seemingly harsh results." *Ogletree*, ___ S.W.3d at ___, 2007 Tex. LEXIS 1028, at *3. Here, they require us to render judgment dismissing appellees' claims against Dr. Bogar with prejudice and awarding Dr. Bogar attorney's fees and costs. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(b). Further, our performance of our duty to effectuate these legislative mandates does not, on this record, exceed constitutional limitations. We accordingly reverse and render a judgment of dismissal and remand to the probate court for a determination of the amount of the attorney's fee award.

_____

Bob Pemberton, Justice

Before Justices Patterson, Pemberton and Waldrop;
    Dissenting Opinion by Justice Patterson

Reversed, Rendered, and Remanded in part

Filed:   May 16, 2008

30