# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-11-00419-CV

**Richard Hebert and Janet Hebert, Appellants**

**v.**

**Timothy E. Hopkins, M.D., and Shannon Clinic, Appellees**

## FROM THE DISTRICT COURT OF TOM GREEN COUNTY, 391ST JUDICIAL DISTRICT NO. D-10-0285-C, HONORABLE THOMAS J. GOSSETT, JUDGE PRESIDING

## O P I N I O N

Richard Hebert and his wife, Janet Hebert, appeal from a district court judgment dismissing, for failure to serve the expert report required by chapter 74 of the civil practice and remedies code, a health care liability claim they asserted against Timothy Hopkins, M.D., and Shannon Clinic.[1] The Heberts bring two issues, urging respectively that (1) the district court abused its discretion in concluding that they failed to serve an expert report complying with chapter 74; and (2) chapter 74's expert-report requirement violates various constitutional protections. We will overrule these contentions and affirm the district court's judgment.

---

[1] The parties have advised us that Richard Hebert died shortly after the Heberts perfected their appeal. As contemplated by rule 7.1 of the rules of appellate procedure, the parties have proceeded on appeal as if all parties are alive, and so have we. *See* Tex. R. App. P. 7.1(a)(1).

**BACKGROUND**

The Heberts filed the underlying suit alleging that Dr. Hopkins, a neurosurgeon, committed professional negligence in performing spinal surgery on Richard Hebert at Shannon in September 2008 after Richard broke his neck in a fall. Specifically, they pled that Richard had presented with a fracture of the cervical 6 (C6) vertebra that was "very unstable" due to a preexisting condition known as ankylosing spondylitis that had self-fused his spinal vertebrae on either side of the fracture; that the standard of care in such circumstances had required Hopkins to perform "an anterior and posterior fusion surgery" to ensure stability; that Hopkins had performed "an anterior fusion with plates and screws at C4-C7 but took no appropriate surgical measures to stabilize the fusion posteriorly;" and that the anterior-only fusion had subsequently "failed as one or more of the screws had pulled out causing the vertebral segments to move and compress the spinal cord at C4-C7," rendering Richard a quadriparetic (i.e., paralyzed in all four limbs). The Heberts asserted that Shannon was vicariously liable for Hopkins's negligence by virtue of Hopkins's status as a "partner or member" of the clinic.

Within 120 days thereafter, in an attempt to comply with chapter 74's expert-report requirement, the Heberts served a report from P. Merrill White, M.D., along with Dr. White's curriculum vitae.[2] Hopkins and Shannon timely objected to the sufficiency of Dr. White's report,

---

[2] *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(a) (West 2011) ("In a health care liability claim, a claimant shall, not later than the 120th day after the date the original petition was filed, serve on each party or the party's attorney one or more expert reports, with a curriculum vitae of each expert listed in the report for each physician or health care provider against whom a liability claim is asserted.").

In the absence of material intervening substantive changes, we have cited the current version of chapter 74 for convenience.

asserting that the report had failed to adequately set forth, and was "conclusory" with respect to the underlying factual bases of, opinions regarding the applicable standard of care for Hebert in light of his underlying medical conditions, the manner in which Hopkins's care had failed to meet that standard, or a causal linkage to the fusion failure and Richard's injuries.[3] By now, the 120-day period for serving an "expert report" had expired, so appellees also moved to dismiss the Heberts' suit with prejudice and sought a mandatory award of attorney's fees.[4] Both sides submitted briefing on the merits of appellees' objections. Following a hearing at which the parties presented argument, the district court sustained appellees' objections but granted the Heberts a thirty-day extension to cure any deficiencies.[5]

Within the extension period, the Heberts served a supplemental report from White. Contending that White's supplemental report had failed to cure the deficiencies in his original report, appellees again moved to dismiss the Heberts' suit with prejudice.[6] The Heberts filed a response joining issue regarding the sufficiency of the two reports and also asserting that chapter 74's expert-

---

[3] *See id.* ("Each defendant physician or health care provider whose conduct is implicated in a report must file and serve any objection to the sufficiency of the report not later than the 21st day after the date it was served, failing which all objections are waived.").

[4] *See id.* § 74.351(b) ("If, as to a defendant physician or health care provider, an expert report has not been served within the period specified by Subsection (a), the court, on the motion of the affected physician or health care provider, shall . . . enter an order that: (1) awards to the affected physician or health care provider reasonable attorney's fees and costs of court incurred by the physician or health care provider; and (2) dismisses the claim with respect to the physician or health care provider, with prejudice to the refiling of the claim."); *see also id.* § 74.351(c) (recognizing that "an expert report has not been served within the period specified by Subsection (a)" when "elements of the report are found deficient").

[5] *See id.* § 74.351(c).

[6] *See id.* § 74.351(b), (c).

3

report requirement violates various protections of the U.S. or Texas constitutions. Following a hearing, the district court granted appellees' motion to dismiss. Subsequently, after hearing evidence, the district court awarded appellees attorney's fees as required by chapter 74,[7] and this order also served to make the court's prior dismissal order final. The Heberts then timely perfected this appeal.

## ANALYSIS

**Sufficiency of expert reports**

In their first issue, the Heberts urge that the district court abused its discretion in holding that Dr. White's report, either in its original form or as supplemented, did not represent an objective good faith effort to comply with the statutory definition of an expert report.

The standards governing the contents of the expert report or reports required by chapter 74 are well established. Chapter 74 defines an "expert report" as "a fair summary of the expert's opinion as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed."[8] "A court shall grant a motion challenging the adequacy of an expert report only if it appears to the court, after hearing, that the report does not represent an objective good faith effort to comply" with this

---

[7] *See id.* § 74.351(b)(1).

[8] *See id.* § 74.351(r)(6). Chapter 74 also imposes requirements regarding the qualifications of the "expert" who may prepare an "expert report," *see id.* § 74.351(r)(5), but appellees have not disputed that White meets those standards here.

4

definition of "expert report."[9]  To constitute a "good faith effort," as the Texas Supreme Court

has explained, the report must include the expert's opinion on "each of the three main elements:

standard of care, breach, and causation," and must provide enough information to fulfill

two purposes with respect to each element:  (1) it must inform the defendant of the specific conduct

the plaintiff has called into question; and (2) it must provide a basis for the trial court to conclude

that the claims have merit.  *See Jelinek v. Casas*, 328 S.W.3d 526, 538-40 & n.9 (Tex. 2010); *Bowie*

*Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002) (per curiam); *American Transitional Care*

*Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 878-79 (Tex. 2001).  Although these requirements do

not require a plaintiff to marshal all of his or her proof or to present expert testimony in a form that

would be admissible at trial, *see Jelinek*, 328 S.W.3d at 539-40 & n.9, they do necessitate that "the

expert must explain the basis for his statements to link his conclusions to the facts" and not merely

state conclusions.  *Id*. (quoting *Wright*, 79 S.W.3d at 52 (quoting *Earle v. Ratliff*, 998 S.W.2d 882,

890 (Tex. 1999))); *see also id*. at 539-40 (observing, with respect to the causation element,"the

expert must . . . explain, to a reasonable degree, how and why the breach caused the injury based on

the facts presented").  This is so, in the supreme court's view, because "'[a] report that merely states

the expert's conclusions about the standard or care, breach, and causation' does not fulfill the

two purposes of a good-faith effort."  *Id*. at 539 (quoting *Palacios*, 46 S.W.3d at 879); *see also id*.

at 540 (expert "must include sufficient detail" regarding how breach caused plaintiff's injuries "to

allow the trial court to determine if the claim has merit").

---

[9] *Id.* § 74.351(*l*).

Importantly, the only information relevant to determining whether an expert report complies with these requirements is that contained within "the four corners" of the report itself. *Palacios*, 46 S.W.3d at 878. Consequently, neither the trial court nor this Court may infer additional opinions or underlying facts to fill in gaps that the report itself leaves open. *See Wright*, 79 S.W.3d at 53; *see also Austin Heart, P.A. v. Webb*, 228 S.W.3d 276, 279 (Tex. App.—Austin 2007, no pet.) (this requirement "precludes a court from filling gaps in a report by drawing inferences or guessing as to what the expert likely meant or intended" (citing *Wright*, 79 S.W.3d at 53)).

Our standard of review is likewise limited. Chapter 74 imposes a mandatory duty on a trial court to grant a motion challenging the adequacy of an expert report "if it appears to the court" that the report does not meet the above-described requirements. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(*l*) ("A court *shall* grant a motion challenging the adequacy of an expert report only if it appears to the court . . . that the report does not represent an objective good faith effort to comply with the definition of an expert report in Subsection (r)(6).") (emphasis added). Conversely, the trial court is prohibited from granting such a motion unless such noncompliance "appears to the court." *Id*. ("A court shall grant a motion challenging the adequacy of an expert report *only* if it appears to the court . . . .") (emphasis added). But the linchpin determination that controls which of these two alternative sets of mandatory duties applies—whether "it appears to the court" that the report does not comply with the requirements—has been committed to the trial court's sound discretion by the Legislature. *See Palacios*, 46 S.W.3d at 877-78. Consequently, we review the trial court's determination for abuse of that discretion. *See Wright*, 79 S.W.3d at 52 (citing *Palacios*, 46 S.W.3d at 878).

6

A trial court abuses its discretion when it acts in an arbitrary or unreasonable manner without reference to any guiding rules or principles. *See id*. (citing *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985)). "When reviewing matters committed to the trial court's discretion, a court of appeals may not substitute its own judgment for the trial court's judgment." *Id*. (citing *Flores v. Fourth Court of Appeals*, 777 S.W.2d 38, 41 (Tex. 1989)). We do not, in other words, examine the contents of Dr. White's reports and make our own de novo determination as to whether he has provided sufficient information, with respect to his opinions regarding standard of care, breach, and causation, to (1) inform appellees of the specific conduct the Heberts have called into question; and (2) provide a basis for the district court to conclude that the claims have merit. *See Jelinek*, 328 S.W.3d at 538-40 & n.9; *Wright*, 79 S.W.3d at 52; *Palacios*, 46 S.W.3d at 878-79. Instead, we determine only whether the district court acted arbitrarily, unreasonably, and without reference to guiding rules and principles in determining that the reports failed to provide that information. *See Wright*, 79 S.W.3d at 52; *see also Jelinek*, 328 S.W.3d at 542 (Jefferson, C.J., dissenting) ("The dividing line between a sufficient and an inadequate report is impossible to draw precisely. We have said, therefore, that the determination must be made in the first instance by the trial court, and review of that decision asks not how an appellate court would have resolved that issue, but instead whether the trial court abused its discretion.") (citing *Jernigan v. Langley*, 195 S.W.3d 91, 93 (Tex. 2006); *Walker v. Gutierrez*, 111 S.W.3d 56, 63 (Tex. 2003)).

Applying this deferential abuse-of-discretion standard of review, we cannot conclude that the district court acted arbitrarily, unreasonably, and without guiding rules and principles in determining that Dr. White's reports did not supply it sufficient information regarding his opinions

7

concerning standard of care and breach, as they relate to the underlying facts, to enable it to determine whether the Heberts' claims had merit.

In his initial report, White summarized medical records reflecting that Richard Hebert sought treatment at Shannon in the early morning hours of September 7, 2008, following a fall in which he injured his neck, and that Richard was placed under Hopkins's care. According to White, CT scans and other evaluations revealed that Richard had suffered "a trace traumatic subarachnoid hemorrhage" (i.e., bleeding on the brain) and a "fracture through the superior vertebral body of C6 with a fracture extending through the posterior elements of C5-6." The injury "was initially managed in a cervical collar which was changed to a Philadelphia collar and spinal precautions were ordered" within about five hours. That same evening, White indicated, Hopkins performed a surgical procedure in which the neurosurgeon fused Richard's C5-C6 vertebrae and implanted "C4 through C7 anterior instrumentation"—a plate over or along the front of Richard's spine, attached by screws to his bone—to provide stability and support while the fracture healed. On the following day, White continued, the medical records indicated that Richard had showed signs of recovery progress and that "[c]ervical collar is discontinued per Dr. Hopkins'[s] order." But four days later, during the afternoon of September 12, Richard had a decline in neurological function and subsequent CT scans "confirm[ed] failure of implant fixation at C6 and C7" and injury to the spinal cord. Although another neurosurgeon, Dr. Duarte, operated on Richard thereafter to remove the failed anterior instrumentation and implement a different type of fixation method, Richard ended up with "increased neurological deficit (quadriparesis)."

The medical records, as summarized by White, additionally reflected that Richard had a history of "coronary artery disease treated with cardiac stints, Plavix, and aspirin; cerebrovascular

8

accident [(i.e., a stroke)] on two occasions with residual left hand paraesthesias [(tingling or prickling sensations)] treated with Plavix and aspirin; and hypertension," as well as "ankylosing spondylitis," a degenerative condition of the spine that causes both brittleness of bones and self-fusion of vertebrae.

Although he did not indicate whether or how Richard's other medical conditions impacted the standard of care, White emphasized his opinion that a patient with ankylosing spondylitis warranted special precautions when performing surgery to address spinal fracture:

> In the surgical treatment of cervical spine fractures complicating ankylosing spondylitis, the prudent spine surgeon must recognize the unstable nature of these fractures. The instability is contributed to by the long level arms cranial and caudal to the fracture site resulting from the multilevel autofusion and poor bone quality associated with ankylosing spondylitis. These two factors result in increased susceptibility to spine fractures as a result of relatively minor trauma, greater instability, and a greater likelihood of neurologic deficit resulting from a cervical fracture than found in patients with cervical spine fractures and otherwise normal spinal anatomy.

> The prudent spine surgeon should design a surgical plan of care allowing decompression of the spinal cord, reduction of the traumatic deformity, and immediate stabilization of the spinal column to protect the spinal cord and to facilitate mobilization and nursing care to the patient in the short term and healing of the spinal fusion in the longer term.

As for the standard of care regarding the specific means by which these objectives should be achieved, White initially suggested that anterior-only internal instrumentation was inconsistent with the standard of care and that some form of posterior internal instrumentation, either additionally or as an alternative to anterior instrumentation, would instead be preferable:

> Over the recent years, the debate of the spinal community has been in which circumstances fusion with posterior only fixation or fusion with anterior and

9

posterior fixation is appropriate. Anterior instrumentation only is predictably inadequate in a fracture pattern with gross anterior and posterior column instability such as Mr. Hebert's. Adequate treatment of Mr. Herbert's [sic] fracture requires anterior and posterior instrumentation in order to meet the standard of care.

In Mr. Herbert's [sic] situation, the standard of care requires fixation stable enough to allow mobilization of the patient without loss of fixation resulting in increased neurological deficits. This goal is more likely to be achieved by multilevel posterior internal fixation in addition to at least single level anterior internal fixation with fusion at appropriate levels.

However, in the next sentence, within the same paragraph, White acknowledged that "clinical situations" could arise in which anterior-only instrumentation, coupled with "supplemental protection" other than posterior implementation, would be consistent with the standard of care:

If the clinical situation in which the surgeon finds himself and the patient allows only inadequate internal fixation, the surgeon is obligated to protect the patient supplementing the internal fixation with external bracing and/or activity limitations. The supplemental protection should continue until the patient can be returned to the operating room for additional internal fixation or the fracture becomes stable through healing.

Following these statements regarding standard of care, White turned to whether or how Hopkins breached an applicable standard. Consistent with the first portion of his explanation of the standard of care, White began by asserting that Hopkins breached the standard by utilizing "anterior only plate/screw fixation":

Dr. Timothy Hopkins'[s] choice of anterior only plate/screw fixation fails to meet the applicable standard of care. Constrained anterior cervical plates function as tension band devices and require relative stability of the posterior elements. In extension these devices resist distraction of the anterior column. These devices do not effectively resist flexion forces and require stable posterior elements to limit deformity resulting from flexion forces. In the absence of adequate posterior stability, anterior plate/screw constructs typically fail in flexion by plate breakage or,

10

as in this case, by screw pullout. Mr. Herbert's [sic] fracture resulted in significant instability of both the anterior and posterior elements at the C5-6 level. Anterior only plate/screw fixation, in this setting, is predictably doomed to failure.

But in the next sentence, White seemed to allude to his previously expressed view that a surgeon could act within the standard of care by "supplementing" otherwise "inadequate internal fixation" with some form of "external bracing and/or activity limitations" as an alternative to posterior surgical fixation:

> The prudent spine surgeon must recognize the limitations of the various internal fixation constructs available and if necessary must compensate for the predictable weaknesses by adequate external bracing and/or activity limitation.

Then White ended his discussion of breach with the following conclusion:

> The standard of care for the surgical treatment of this fracture requires a multilevel posterior fixation and a fusion in conjunction with anterior fixation and fusion with or without supplemental external fixation as was ultimately performed by Dr. Duarte on September 12, 2008.

White then offered the following opinions as to causation, now referencing perceived inadequacies in internal *and* external fixation without elaborating as to the nature or identity of any of the latter category:

> The failure to choose the internal and external fixation construct capable of providing stability to allow mobilization of the patient, prevent spinal displacement, and protect the spinal cord is the proximate cause of Mr. Herbert's [sic] increased neurologic deficit (quadriparesis). This occurred as a result of the constrained anterior plate/screw construct's predictable inability to neutralize flexion forces resulting in screw pullout at C6 and C7 levels followed by displacement of the spinal column through the C5-6 fracture/allograft site with subsequent spinal cord injury and deterioration of neurologic function.

11

Among their objections to the sufficiency of White's initial report, appellees urged that the report did not represent an objective good faith attempt to comply with chapter 74's requirements—i.e., that it discussed the standard of care, breach, and causation with sufficient specificity to (1) inform them of the conduct called into question and (2) provide a basis for the district court to determine that the claims have merit—because it was internally inconsistent as to the standard of care that applied and did not address whether or not Hopkins complied with the standard of care through the use of the "external bracing and/or activity limitation" White had contemplated. And these asserted deficiencies, appellees further suggested, in turn undermined any factual bases underlying White's assertions that the standard of care either required Hopkins's use of anterior-only internal fixation or was breached by his choice not to use posterior interior fixation.

In arguing that the district court abused its discretion in sustaining appellees' objections, the Heberts emphasize the portions of White's initial report focusing on the relative merits of anterior versus posterior internal fixation. But the district court was within its discretion also to consider White's recognition of an apparent exception, qualification, or limitation to his broader criticisms of anterior fixation: "the clinical situation in which the surgeon finds himself and the patient" may "allow[] only inadequate internal fixation," in which case the standard of care could be met by "supplementing the internal fixation with external bracing and/or activity limitations." Along with White's recognition of this aspect of the standard of care, the court also could have reasonably considered that White never elaborated on the nature or type of "clinical situation" that would "allow[] only inadequate internal fixation" or whether such a situation did or did not exist in regard to Richard, a patient who, as White acknowledged in his report, had a history of coronary artery disease, two strokes, and hypertension, not to mention bleeding on the brain from his fall. The

12

court likewise could reasonably have viewed White's references to "external bracing" or "activity limitations" as an alternative to further internal fixation as begging the question as to whether the unspecified "spinal precautions" Hopkins had ordered, the cervical collar Richard wore following surgery, or other "external bracing" or "activity limitations" Hopkins imposed had or had not satisfied the standard of care.

In short, we cannot conclude that the district court acted arbitrarily, unreasonably, or without regard to guiding principles in determining that White's initial report fell short of describing the applicable standard or care or breach thereof, as applicable to the underlying facts, with sufficient specificity to provide the court a basis to determine that White's claims have merit. *See Jelinek*, 328 S.W.3d at 538-40 & n.9; *Wright*, 79 S.W.3d at 52; *Palacios*, 46 S.W.3d at 878-79. And in the face of such deficiencies regarding standard of care and breach, the district court would have acted within its discretion in determining that any assertions by White to the effect that anterior-only internal fixation breaches the standard of care or that only posterior internal fixation can suffice lack an underlying factual basis—i.e., are "conclusory"—and fail to satisfy chapter 74. *See Wright*, 79 S.W.3d at 52 ("the expert must explain the basis of his statements to link his conclusions to the facts" (quoting *Earle*, 998 S.W.2d at 890)).

The Heberts urge us to indulge a "fair reading" that White's opinions regarding unspecified "clinical situations" refers to a surgeon who is attempting to perform a combined anterior and posterior procedure but gets interrupted by "surgical complications such as delays or blood loss," and that no such complications arose here. The dissent similarly relies on inferences or implications that such "extraordinary circumstances" were not present. But the problem with these arguments is that White never actually says any of this in his initial report, and the established rule is that the

13

report must stand or fall on the contents within its "four corners." *Palacios*, 46 S.W.3d at 878. This requirement, again, "precludes a court from filling gaps in a report by drawing inferences or guessing as to what the expert likely meant or intended." *Austin Heart, P.A.*, 228 S.W.3d at 279 (citing *Wright*, 79 S.W.3d at 53).

Nor did the district court abuse its discretion in holding that such deficiencies were not cured by White's supplemental report. In his supplement, although White reiterates and emphasizes at length his conclusions and assertions regarding anterior versus posterior fixation generally, nowhere does he address the deficiencies concerning the standard of care and breach that the district court could have perceived in his initial report.

We overrule the Heberts' first issue.

**Constitutional claims**

In their second issue, the Heberts bring forward constitutional challenges to chapter 74's expert-report requirement. While not appearing to quarrel with the general concept that the Legislature can validly impose some form of threshold report requirement for asserting health care liability claims or other types of civil claims, the Heberts complain about three basic features of chapter 74's expert-report requirement: (1) the fixed deadline of 120 days to serve an expert report, subject to a single 30-day extension; (2) the requirements focusing judicial analysis of a report's sufficiency solely on the "four corners" of the report and prohibiting courts from considering extrinsic evidence of a claim's merits; and (3) the mandatory requirement that courts dismiss health care liability claims with prejudice for failing to serve an adequate expert report and also award attorney's fees. The Heberts contend that these mechanisms unfairly "single out"

14

health care liability claimants for unconstitutional "disparate treatment," deprive courts of judicial discretion in violation of the separation-of-powers protections of the Texas Constitution, and deprive claimants of access to the courts in violation of due-process or open-courts protections.[10]

When reviewing the constitutionality of a statute, we begin with a presumption that it is constitutional. *Herrera v. Seton Nw. Hosp.*, 212 S.W.3d 452, 460-61 (Tex. App.—Austin 2006, no pet.) (citing *Walker*, 111 S.W.3d at 66); *see also* Tex. Gov't Code Ann. § 311.021(1) (West 2005). The wisdom or expediency of the law is the Legislature's prerogative, not ours. *Smith v. Davis*, 426 S.W.2d 827, 831 (Tex. 1968). We presume that the Legislature has not acted unreasonably or arbitrarily. *Sax v. Votteler*, 648 S.W.2d 661, 664 (Tex. 1983) (quoting *Davis*, 426 S.W.2d at 831). The party challenging a statute's constitutionality has the burden of proving that the statute fails to meet constitutional requirements. *Walker*, 111 S.W.3d at 66. A party must show that a statute is unconstitutional either on its face or as applied to that party. *Texas Workers' Comp. Comm'n v. Garcia*, 893 S.W.2d 504, 518 n.16 (Tex. 1995); *see also City of Corpus Christi v. Public Util. Comm'n*, 51 S.W.3d 231, 240-41 (Tex. 2001) (per curiam) (Owen, J., concurring). To sustain a facial challenge, the party must show that the statute, by its terms, always

---

[10] The Heberts acknowledge that Richard's death during the pendency of this appeal may have terminated his open-courts claim. "[W]rongful-death and survival claimants cannot establish an open-courts violation because they 'have no common law right to bring either.'" *Horizon/CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887, 903 (Tex. 2000) (quoting *Bala v. Maxwell*, 909 S.W.2d 889, 893 (Tex. 1995)). The Texas Supreme Court also has declined to rule on an open-courts argument in a similar situation when the claimant died during the pendency of the appeal. *Kallam v. Boyd*, 232 S.W.3d 774, 776 (Tex. 2007) (per curiam). While we have similar reservations, we will address the Heberts' open-courts argument to the extent its substance implicates due-process and due-course-of-law protections they have also raised. *See, e.g.*, *Bogar v. Esparza*, 257 S.W.3d 354, 370 n.6 (Tex. App.—Austin 2008, no pet.) (noting open-court protections not directly implicated in statutory wrongful-death and survivor action before conducting similar due-process analysis).

15

operates unconstitutionally. *Garcia*, 893 S.W.2d at 528 n.16. To sustain an as-applied challenge, the party must show that the statute is unconstitutional when applied to that particular person or set of facts. *Id*.

We note at the outset that the Heberts face an uphill battle because every court that has considered similar challenges to chapter 74's expert-report requirement, including this Court, has rejected them. *See, e.g.*, *Stockton v. Offenbach*, 336 S.W.3d 610, 618 (Tex. 2011) (denying open-courts challenge); *Hightower v. Baylor Univ. Med. Ctr.*, 348 S.W.3d 512, 521-22 (Tex. App.—Dallas 2011, pet. denied) (rejecting special-law, vagueness, due-course-of-law, and separation-of-powers challenges); *Broxterman v. Carson*, 309 S.W.3d 154, 159 (Tex. App.—Dallas 2010, pet. denied) (rejecting due-process challenge); *Gulf Coast Med. Ctr., LLC v. Temple*, No. 13-09-00350-CV, 2010 WL 196972, at *6 (Tex. App.—Corpus Christi Jan. 21, 2010, no pet.) (mem. op.) (rejecting due-process and due-course-of-law challenges); *Bogar v. Esparza*, 257 S.W.3d 354, 372-73 (Tex. App.—Austin 2008, no pet.) (same); *Wilson-Everett v. Christus St. Joseph*, 242 S.W.3d 799, 802-04 (Tex. App.—Houston [14th Dist.] 2007, pet. denied) (rejecting separation-of-powers challenge); *Ledesma v. Shashoua*, No. 03-05-00454-CV, 2007 WL 2214650, at *9 (Tex. App.—Austin Aug. 3, 2007, pet. denied) (mem. op.) (rejecting due-process and open-courts challenges); *Thoyakulathu v. Brennan*, 192 S.W.3d 849, 855-56 (Tex. App.—Texarkana 2006, no pet.) (due process does not require "exceptions [to the expert-report requirement] that would encompass any conceivable complication in order to pass constitutional muster"); *Herrera*, 212 S.W.3d at 461-62 (rejecting equal-protection, due-process, due-course-of-law, and open-courts challenges). Texas courts also uniformly rejected constitutional challenges to an expert-report requirement under chapter 74's predecessor statute, article 4590i. *See, e.g.*, *Strom v. Memorial*

*Hermann Hosp. Sys.*, 110 S.W.3d 216, 227 (Tex. App.—Houston [1st Dist.] 2003, pet. denied) (rejecting due-process, equal-protection, and jury-trial challenges); *Villa v. Hargrove*, 110 S.W.3d 74, 81 (Tex. App.—San Antonio 2003, pet. denied) (rejecting due-process and equal-protection challenges); *Walker*, 111 S.W.3d at 66 (rejecting due-process challenge); *Perry v. Stanley*, 83 S.W.3d 819, 825 (Tex. App.—Texarkana 2003, no pet.) (rejecting open-courts challenge); *Mocega v. Urquhart*, 79 S.W.3d 61, 64 (Tex. App.—Houston [14th Dist.] 2002, pet. denied) (same); *Gill v. Russo*, 39 S.W.3d 717, 718-19 (Tex. App.—Houston [1st Dist.] 2001, pet. denied) (same); *Knie v. Piskun*, 23 S.W.3d 455, 467 (Tex. App—Amarillo 2000, pet. denied) (rejecting equal-protection, due-process, open-courts and free-speech challenges); *Schorp v. Baptist Mem'l Health Sys.*, 5 S.W.3d 727, 736-38 (Tex. App.—San Antonio 1999, no pet.) (rejecting due-process, open-courts, and jury-trial challenges).[11]

The Heberts acknowledge the constitutional validity of the expert-requirement in chapter 74's predecessor statute, article 4590i, but attempt to distinguish it as "less draconian." *See* Act of May 5, 1995, 74th Leg., R.S., ch. 140, § 1, sec. 13.01, 1995 Tex. Gen. Laws 985, 985-88, *repealed and recodified as amended* by Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 10.01, sec. 74.351, 2003 Tex. Gen. Laws 847, 875-77 (amended 2005) (current version at Tex. Civ. Prac. & Rem. Code Ann. § 74.351). They emphasize differences in the deadlines article 4590i imposed

---

[11] In their reply brief, the Heberts attempt to distinguish some of these cases on the basis that they involved "a complete failure to file an expert report," instead of "addressing the legislature's restriction placed on the courts in deciding the issue" of a report's sufficiency. However, Texas courts, including this Court, have rejected constitutional challenges where, as here, an expert report was served, but found deficient. *See, e.g.*, *Hightower v. Baylor Univ. Med. Ctr.*, 348 S.W.3d 512, 520 (Tex. App.—Dallas 2011, pet. denied) (upholding dismissal of deficient reports); *Ledesma v. Shashoua*, No. 03-05-00454-CV, 2007 WL 2214650, at *7-8 (Tex. App.—Austin Aug. 3, 2007, pet. denied) (mem. op.) (same).

for serving expert reports and the extent of discretion vested in trial courts to extend deadlines. Specifically, article 4590i allowed claimants to either serve an expert report within 90 days of filing suit or file a cost bond. *See* former art. 4590i, § 13.01(a). An expert report was required within 180 days of suit, though the court could grant a 30-day extension if the failure to serve was not intentional or the result of conscious indifference, but was the result of an accident or mistake. *Id*. § 13.01(d), (g).

The Heberts also assert that "4590i did not mandate what had to be included in the contents of the report," and that "there was no requirements or authorization for the court to summarily dismiss the case based on the deficiencies in the language of the report." They also contend that parties opposing an article 4590i expert report had to "satisfy summary judgment procedures to secure a dismissal with prejudice." To the contrary, a court considering the sufficiency of an expert report under article 4590i, as under chapter 74, was limited to the "four corners" of the report. *See Palacios*, 46 S.W.3d at 878. Likewise, if a claimant failed to serve a report, or served a report that the trial court concluded did not represent a good faith effort to comply with the statutory definition of expert report, the trial court was required to dismiss the case with prejudice and award costs and attorney's fees to the opposing party. *See* former art. 4590i, § 13.01(e), (*l*), (r)(6); *see also Palacios*, 46 S.W.3d at 877.

### *"Disparate treatment"*

The Heberts contend that chapter 74 irrationally singles them out for disparate treatment in violation of their rights to due process and equal protection. The due-course-of-law guarantee of the Texas Constitution provides: "No citizen of this State shall be deprived of liberty,

18

property, privileges or immunities, or in any manner disenfranchised, except by due course of the law of the land." Tex. Const. art. I, § 19. Similarly, the federal due-process clause provides: "No state shall make or enforce any law which shall abridge the privileges or immunities of the citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; . . . ." U.S. Const. amend. XIV, § 1. While the Texas Constitution is textually different in that it refers to "due course" rather than "due process," Texas courts regard these terms as without substantive distinction unless and until a party demonstrates otherwise, and the Heberts suggest no reason to construe them differently here. *See University of Tex. Med. Sch. at Houston v. Than*, 901 S.W.2d 926, 929 (Tex. 1995) (citing *Mellinger v. City of Houston*, 3 S.W. 249, 252-53 (1887)).

Under federal and state guarantees of due process, legislation that does not affect a fundamental right or interest is valid if it bears a rational relationship to a legitimate state interest. *Rylander v. B & A Mktg. Co. ex rel. Atl. Richfield Co.*, 997 S.W.2d 326, 333-34 (Tex. App.—Austin 1999, no pet.) (citing *Williamson v. Lee Optical*, 348 U.S. 483, 491 (1955); *Garcia*, 893 S.W.2d at 525). Similarly, the constitutional guarantee of equal protection requires only that disparate treatment of different classifications be rationally related to a legitimate state purpose, unless the classification impinges on the exercise of a fundamental right or distinguishes between people on a "suspect" basis, such as race or national origin.[12] The Heberts have not demonstrated that

---

[12] Classifications that impinge upon the exercise of a fundamental right or distinguish between people on a suspect basis (i.e., race, national origin, and alienage) "are subject[] to strict scrutiny and will be sustained only if they are suitably tailored to serve a compelling state interest." *City of Cleburne v. Cleburne Living Ctr. Inc.*, 473 U.S. 432, 440 (1985) (plurality opinion). When a statute burdens a sensitive class or impinges on an important right, the statute is subject to an intermediate level of scrutiny, which requires a showing that the statute is substantially related to an important state interest. *Id*. at 440-41.

chapter 74 impinges on a fundamental or important right or a suspect class. By its terms, chapter 74 is facially neutral and applies to any party asserting a health care liability claim. Consequently, in addressing the Heberts' due-process and equal-protection claims, we must determine whether chapter 74 bears a rational relationship to a legitimate state interest and whether the Legislature had a rational basis in differentiating between health care liability claimants and other litigants. "In so doing, we must uphold the law if we can conceive of any rational basis for the Legislature's action." *Owens Corning v. Carter*, 997 S.W.2d 560, 581 (Tex. 1999).

In enacting chapter 74, the Legislature made a number of findings about the state of the health care system in Texas. *See* Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 10.11, 2003 Tex. Gen. Laws 847, 884-85. Specifically, it found the frequency of claims and the amounts paid out by insurers in judgments and settlements had risen inordinately since 1995, which created a public problem in the availability and affordability of adequate medical professional liability insurance. *Id*. § 10.11(a)(1), (3), (4). This "crisis" increased costs to physicians, hospitals, patients, and the public. *Id*. § 10.11(a)(5), (7). As a result, the Legislature concluded the "adoption of certain modifications in the medical, insurance and legal systems" would "have a positive effect on the rates charged by insurers for medical professional liability insurance." *Id*. § 10.11(a)(12). In enacting various measures, including chapter 74, the Legislature intended to reduce the frequency and severity of health care liability claims, decrease costs of claims, and ensure that awards were rationally related to costs, but "do so in a manner that will not unduly restrict a claimant's rights any more than necessary to deal with the crisis." *Id*. § 10.11(b)(1), (2), (3).

In *Smalling v. Gardner*, the Fourteenth Court of Appeals recognized that the "legislature has broad authority to create classifications for legislative purposes, so long as they

20

have a reasonable basis and operate equally on all persons within the class." 203 S.W.3d 354, 371 (Tex. App.—Houston [14th Dist.] 2005, pet. denied) (addressing special-law challenge to constitutionality of article 4590i).[13] The expert report is required only for claims against healthcare providers for departures from accepted standards of medical or health care or safety. *Id*. Accordingly, the expert-report requirement applies equally to all physicians and health care providers and rationally relates to the interests of the State "in ensuring that medical practitioners were not 'being placed in the situation of defending frivolous claims at a high cost' to the health care system." *Id*. (quoting *Schorp*, 5 S.W.3d at 737). Recently, the Dallas Court of Appeals adopted the *Smalling* analysis and applied it to chapter 74. *See Hightower*, 348 S.W.3d at 521.

While *Smalling* and *Hightower* dealt with special-law challenges, we previously rejected an equal-protection challenge to chapter 74's predecessor for similar reasons. *Fields v. Metroplex Hosp. Found.*, No. 03-04-00516-CV, 2006 WL 2089171, at *4 (Tex. App.—Austin July 28, 2006, no pet.) (mem. op.) ("[T]he legislature determined that medical liability plaintiffs should be treated differently because of the negative effects of the numbers and cost of their lawsuits had on the provision of health care."). In that case, the claimant failed to show article 4590i's expert-report requirement was not rationally or substantially related to the government's interest in reducing the aggregate costs of defending against frivolous costs and reducing the costs of insurance and medical care to all. *Id.*; *see also Bogar*, 257 S.W.3d at 373 (in addressing due-process challenge to chapter 74: "We disagree that it is irrational, in light of the

---

[13] Though the Heberts did not explicitly claim chapter 74 was an unconstitutional special law prohibited by the Texas Constitution, many of their complaints track arguments raised by parties who have raised such claims. Accordingly, we find cases addressing special-law challenges instructive.

legislature's goal of curtailing frivolous health care liability claims, for it to require that appellees serve an expert report explaining why or how this outcome was actually caused by the conduct of [the defendant], as opposed to some other person or health care provider.").

The Heberts challenge the Legislature's rationale as "pre-textual, not supported by empirical data and refuted by surveys showing there aren't excessive frivolous medical malpractice suits." They reason that because the Legislature had previously acted to curb frivolous medical malpractice claims by enacting article 4590i, its subsequent enactment of chapter 74 reflects intent to "single out medical malpractice claimants for special and harsh treatment by making it so onerous to file and prosecute [a claim] that they or their counsel will not take the case, or once it is filed, to make it so difficult to prosecute the case that they or their counsel will just give up." The Heberts likewise complain that chapter 74 strips them "of all the rights accorded to other litigants in the Texas Rules of Civil Procedure," but does not place similar restrictions on "major corporations like insurance companies and banks suing for breach of contract, or on individual or corporate clients suing attorneys, accountants, bankers and brokers." According to the Heberts, no compelling state interest or rational basis supports this "arbitrary" classification.

We find no merit in the Heberts' argument that the Legislature, evaluating the impact of 4590i, could not have rationally concluded that a problem had nonetheless persisted in the cost and availability of health care due to the prevalence of medical-malpractice suits. To the extent the Heberts challenge the underlying policies of chapter 74, it is not our place to question the Legislature's policy decisions when conducting a rational basis review. *See Bell v. Low Income Women of Tex.*, 95 S.W.3d 253, 264 (Tex. 2002) ("The restriction clearly serves [the act's] purposes, and it is not for us to second-guess the Legislature's policy choices."). The Heberts fail

22

to demonstrate that the Legislature lacked any rational basis in differentiating between health care liability claimants and other litigants. Accordingly, we reject the Heberts' "disparate treatment" constitutional challenges.

### *Separation of powers*

For similar reasons, the Heberts' other constitutional challenges fail. They claim the Legislature has impermissibly interfered with the judicial branch through chapter 74. The Texas Constitution vests the judicial power of the State in the courts. Tex. Const. art. V, § 1. The separation-of-powers requirement prohibits one branch of government from exercising a power inherently belonging to another branch. *Id*. art. II, § 1; *Wilson-Everett*, 242 S.W.3d at 802 (citing *General Servs. Comm'n v. Little-Tex Insulation Co*., 39 S.W.3d 591, 600 (Tex. 2001)). Only when the executive or legislative branch interferes with the functioning of the judicial process in a field constitutionally committed to the control of the courts does a constitutional problem arise. *Wilson-Everett*, 242 S.W.3d at 802.

Chapter 74's expert report imposes a threshold procedural requirement aimed at filtering out meritless or premature lawsuits from proceeding until a claimant makes a good-faith effort to demonstrate that at least one expert believes that a breach of the applicable standard of care caused the claimed injury. *Id*. at 802-04 (rejecting argument that chapter 74 "interefere[d] with the judiciary's constitutional power to decide when and how to render judgments" (citing *Murphy v. Russell*, 167 S.W.3d 835, 838 (Tex. 2005) (per curiam); *Walker*, 111 S.W.3d at 66). Though the Heberts contend chapter 74 "prohibits the courts from using the rules of procedure and directs the courts in every respect," in actuality, the courts retain the judicial power to determine whether a

timely served report is adequate in this regard and to render a decision accordingly. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(*l*), (r)(6); *see also Carrick v. Summers*, 294 S.W.3d 886, 891 (Tex. App.—Beaumont 2009, no pet.) ("[I]mposing a strict, non-discretionary time limit on serving the expert report does not restrict the trial court's power to hear evidence, determine the facts of a case and the rights of the parties, apply the law to the facts and to enter a judgment appropriate to the case, any more than a statute of limitations does."). The same is true of chapter 74's requirement that courts award attorney's fees upon dismissal. *Hightower*, 348 S.W.3d at 522 (rejecting separation-of-powers challenge based on attorneys' fees provision because "court still retains its constitutional authority to determine the reasonable fees based on the law and the evidence presented by the parties"). The Heberts offer no persuasive authority to the contrary. Accordingly, we reject the Heberts' separation-of-powers constitutional challenge.

### *Right of access*

Finally, the Heberts argue chapter 74 violates their right of access to the courts and due course of law. The open-courts provision of the Texas Constitution guarantees litigants the right to redress their grievances. Tex. Const. art. I, § 13; *LeCroy v. Hanlon*, 713 S.W.2d 335, 341 (Tex. 1986). It protects a person from having his or her right to sue cut off by a legislative act before the individual has been afforded a reasonable opportunity to discover the wrong and bring suit. *Shah v. Moss*, 67 S.W.3d 836, 842 (Tex. 2001). It is premised on the rationale that the Legislature has no power to make a remedy by due course of law contingent upon an impossible condition. *Hightower*, 348 S.W.3d at 522 (citing *Moreno v. Sterling Drug, Inc.*, 787 S.W.2d 348, 355 (Tex. 1990)); *see also Stockton*, 336 S.W.3d at 618 (rejecting open-courts challenge based on

24

chapter 74's 120-day deadline). To prove that the statute violates the open-courts provision, the Heberts must show that: (1) a cognizable common law cause of action is being restricted, and (2) the restriction is unreasonable or arbitrary when balanced with the statute's purpose and basis. *Sax*, 648 S.W.2d at 666.

A claimant bringing an as-applied open-courts challenge to chapter 74 must show that the expert-report requirements actually prevented him from bringing his claims. *Herrera*, 212 S.W.3d at 461; *McGlothlin v. Cullington*, 989 S.W.2d 449, 453 (Tex. App.—Austin 1999, pet. denied). The Heberts failed to prove how the provisions of chapter 74, as opposed to their own failure to provide an adequate report, prevented them from pursuing their claims. *See Ledesma*, 2007 WL 2214650, at *9 (rejecting open-courts challenge when plaintiff failed to serve sufficient reports); *see also Stockton*, 336 S.W.3d at 618-19 (rejecting as-applied open-courts challenge when plaintiff failed to exercise due diligence in serving expert report on defendant physician).

As discussed above, the Heberts have also failed to show chapter 74 is unreasonable or arbitrary when balanced with the statute's purpose and basis. Health care liability claims require expert testimony at trial. *See Smalling*, 203 S.W.3d at 371. The expert-report requirement "'does not violate the open-courts provision by requiring an expert report sooner rather than later in the litigation.'" *Id*. (addressing article 4590i (quoting *Mocega*, 79 S.W.3d at 64)); *see also Gill*, 39 S.W.3d at 718-19 (article 4590i expert-report requirement did not violate open-courts provision because plaintiff raising medical negligence claim required to prove claim by competent expert testimony to avoid summary judgment and/or prevail at trial); *Bankhead v. Spence*, 314 S.W.3d 464, 466 (Tex. App.—Waco 2010, pet. denied) ("This Court and others have determined that the expert-report requirement itself does not violate the open-courts guarantee because it 'is rationally related

25

to the purpose of the statute to discourage frivolous malpractice suits.'" (quoting *Powell v. Clements*, 220 S.W.3d 138, 140 (Tex. App.—Waco 2007, pet. denied))); *Fields*, 2006 WL 2089171, at \*4 (holding report requirement not so onerous that it "effectively deprived the litigant of access to the court").[14]

The Heberts have failed to demonstrate a constitutional defect in chapter 74's expert-report requirement.[15] Accordingly, we overrule their second issue.[16]

---

[14] The Heberts also argue that chapter 74 "effectively revives the general demurrer practice which permitted judges to dismiss cases on the pleadings." They argue that summary judgment is the preferred method for defendants to obtain a dismissal on the merits. Our rules of procedure prohibit the use of general demurrers. Tex. R. Civ. P. 90. However, "[w]hen a rule of procedure conflicts with a statute, the statute prevails unless the rule has been passed subsequent to the statute and repeals the statute . . . ." *Johnstone v. State*, 22 S.W.3d 408, 409 (Tex. 2000) (per curiam). The current version of chapter 74 was passed in 2003 and amended in 2005; rule 90 was approved in 1940 and amended in 1980. Thus, to the extent chapter 74 and rule 90 conflict, chapter 74 controls. *See Mitchell v. Berry*, No. 05-06-01328-CV, 2007 WL 4111923, at \*4 (Tex. App.—Dallas Nov. 20, 2007, pet. denied) (mem. op.) (rejecting argument Tex. Civ. Prac. & Rem. Code Ann. § 13.001 allowing for dismissal in inability-to-pay cases was a general demurrer in contravention of Rule 90); *see also Smalling v. Gardner*, 203 S.W.3d 354, 367 n.8 (Tex. App.—Houston [14th Dist.] 2005, pet. denied) (distinguishing dismissal under general demurrer from dismissal for failure to serve expert report).

[15] The Heberts make passing reference to infringement of their right to trial by jury, but provide no authority or argument in support of any challenge based on that provision that is distinct from their other arguments. To the extent the Heberts intended to advance a distinct challenge based on their right to jury trial, it too would fail. The right to a jury trial is not an absolute right in civil cases, but is subject to certain procedural rules. *Schorp v. Baptist Mem'l Health Sys.*, 5 S.W.3d 727, 738 (Tex. App.—San Antonio 1999, no pet.) (citing *Wooten v. Dallas Hunting & Fishing Club, Inc.*, 427 S.W.2d 344, 346 (Tex. Civ. App.—Dallas 1968, no writ)). "Imposing the requirement to file an expert report and the failure to meet that requirement allows the trial court to dismiss the case. This dismissal is not based on the merits, but merely operates to dismiss the case on a procedural requirement which is directly related to the statute's purpose of limiting the number of frivolous suits." *Id.* (addressing article 4590i (citing *Buckholts Indep. Sch. Dist. v. Glaser*, 632 S.W.2d 146, 149 (Tex. 1982) (holding that failure of plaintiff to fulfill bonding requirement for challenging school board election did not deny taxpayer right to jury trial on merits))).

[16] The Heberts point to decisions from other jurisdictions that, in their view, struck down expert-report requirements similar to chapter 74 based on constitutional provisions analogous to the

## CONCLUSION

Having overruled the Heberts' issues on appeal, we affirm the district court's judgment.

_____

Bob Pemberton, Justice

Before Chief Justice Jones, Justices Pemberton and Rose;
    Dissenting Opinion by Chief Justice Jones

Affirmed

Filed: March 1, 2013

---

protections on which they rely here. *See, e.g.*, *Putnam v. Wenatchee Valley Med. Ctr.*, 216 P.3d 374, 378-79 (Wash. 2009) (law requiring certificate of merit from expert at time of filing violated separation of powers and right of access as it cut off rights of discovery and abrogated pleading requirements in rules of procedure); *Wimley v. Reid*, 991 So.2d 135, 138 (Miss. 2008) (law requiring certificate of merit violated separation of powers); *Summerville v. Thrower*, 253 S.W.3d 415, 421 (Ark. 2007) (law requiring expert affidavit within 30 days of suit violated separation of powers); *Zeier v. Zimmer, Inc.* 152 P.3d 861, 873 (Okla. 2006) (law requiring affidavit of merit with petition barred right of access). They also acknowledge that courts in at least two jurisdictions upheld laws similar to chapter 74. *See McAlister v. Schick*, 588 N.E.2d 1151, 1157-58 (Ill. 1992); *Mahoney v. Doerhoff Surgical Servs. Inc.*, 807 S.W.2d 503, 512-13 (Mo. 1991). Additionally, they favorably cite cases from other jurisdictions that upheld similar laws "so long as the Legislature [does] not direct[] the Courts how to decide the legitimacy of the case." Texas decisions regarding chapter 74 are consistent with that reasoning. *See, e.g.*, *Wilson-Everett v. Christus St. Joseph*, 242 S.W.3d 799, 803 (Tex. App.—Houston [1st Dist.] 2007, pet. denied) (rejecting argument that chapter 74 "interfere[d] with the judiciary's constitutional power to decide when and how to render judgments"). In any event, cases from other jurisdictions have no precedential value for this Court. Instead, we are bound to follow the Supreme Court of Texas and our own precedent, as well as the persuasive cases of our sister courts. Texas authorities have consistently rejected constitutional challenges similar to those advanced by the Heberts.