# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-20-00394-CV

**Aveen B. Zachariah, D.O., and Austin Regional Clinic, P.A., Appellants**

**v.**

**Alfred J. Durtschi, Individually and as Executor of the Estate of Doris A. Liesenfelt, Deceased, Appellee**

### FROM THE 419TH DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-GN-19-00523, THE HONORABLE AMY CLARK MEACHUM, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

In this medical malpractice case, Aveen B. Zachariah, D.O., and Austin Regional Clinic, P.A., appeal from the trial court's interlocutory order overruling their objections to Dr. Juan C. Salgado's amended expert report and denying their motion to dismiss and request for attorney's fees. *See* Tex. Civ. Prac. & Rem. Code §§ 51.014(a)(9) (authorizing appeal from interlocutory order denying relief sought under section 74.351(b) of Texas Medical Liability Act (TMLA)), 74.351(b) (generally requiring dismissal of heath care liability claim on motion of defendant physician or health care provider when claimant fails to comply with threshold expert report requirement and requiring trial court to award attorney's fees and costs when expert report is not served within statutory deadline). In two issues, appellants argue that the trial court abused its discretion (1) in denying their motion to dismiss because Dr. Salgado was not qualified, and his opinions were deficient, and (2) in denying their request for attorney's fees and costs.

Because we conclude that the trial court did not abuse its discretion in denying appellants' motion to dismiss and request for attorney's fees and costs, we affirm the trial court's order.

## BACKGROUND

Alfred Durtschi,[1] individually and as executor of the estate of Doris A. Liesenfelt, deceased, sued Dr. Zachariah and Austin Regional Clinic for health care liability claims arising from Dr. Zachariah's medical care of Liesenfelt.[2] Durtschi alleged that Dr. Zachariah was negligent in his medical care and that Austin Regional Clinic was vicariously liable for his negligence. In his petition, Durtschi alleged that:

- on June 20, 2018, Dr. Zachariah removed an abscess from the shoulder of Liesenfelt, who was "64 years old and in very good health";[3]

- on July 23, Liesenfelt returned to Dr. Zachariah because of "significant back pain and frequent urination," and he prescribed "pain medication and referred her to physical therapy";

- on July 27, Liesenfelt's pain and symptoms continued to worsen, she presented to an emergency room, a "blood culture revealed positive findings for multiple strands of streptococcus," and a CT scan of the abdomen and pelvis revealed acute cholecystitis,

---

[1] Counsel for Alfred Durtschi has notified this Court that Durtschi has passed away. Despite his death after the inception of this appeal, we use his name (rather than that of his heirs or estate) in this opinion. *See* Tex. R. App. P. 7.1(a)(1) (providing that when party in civil case dies during pendency of appeal, appellate court proceeds to adjudicate appeal "as if all parties were alive" and that "decedent party's name may be used on all papers"). Further, Durtschi's death does not end the controversy between the parties. *See Kenseth v. Dallas County*, 126 S.W.3d 584, 593 (Tex. App.—Dallas 2004, pet. denied) (explaining that "if a claim remains that involves the property rights of the parties, then the claim survives the death of a party").

[2] Durtschi sued other health care providers but nonsuited those claims.

[3] The petition incorrectly states that the abscess removal occurred on July 9, 2018, but the parties agree that it occurred on June 20, 2018, which is the date that Dr. Salgado also states in his report: "On 6/20/18, . . . Dr. Zachariah diagnosed Ms. Liesenfelt with an infectious process to her back as well as had an abscess drained and was discharged with an antibiotic prescription."

"an inflammation of the gall bladder, typically occurring when a gallstone obstructs the cystic duct";

- that same day, Liesenfelt's gall bladder, which was "gangrenous in appearance" with "a large amount of exudate and fluid around the gallbladder and liver," was removed;

- following her discharge from the hospital, Liesenfelt's illness continued and she began experiencing "severe back pain" and other symptoms until she was rushed back to the emergency room on August 28 and diagnosed with "severe sepsis with shock";

- the following day, an MRI showed "complicated MSSA bacteremia with extensive epidural abscess," which required "surgical aspiration of the epidural abscess to attempt clearance of bacteremia";

- "Liesenfelt's condition worsened following the surgical evaluation," and "cultures from [the] epidural abscess drainage grew MRSA, despite the fact that her blood cultures have been growing MSSA"; and

- a few days later, Liesenfelt died of "septic shock secondary to MRSA infection with multi-organ failure."

Durtschi timely served appellants with Dr. Salgado's expert report and curriculum vitae (CV). *See id.* § 74.351(a) (generally requiring claimant to serve expert report within 120th day after defendant's original answer is filed), (r)(6) (defining "expert report"). In his report, Dr. Salgado addressed his background and qualifications, listed the medical records that he reviewed, provided a summary of medical events, and then opined about the standard of care for a family care physician like Dr. Zachariah, his breaches of the standard of care, and the causal connection between Dr. Zachariah's breaches of the standard of care and Liesenfelt's death. Dr. Salgado opined that Dr. Zachariah breached the standard of care:

by not ordering any radiological testing concurrently with his 6/20/18 abscess removal, by not insisting on a prompt follow-up following the 6/20/18 abscess removal, and by not ordering any radiological testing following the 7/23/18 visit despite his knowledge of Ms. Liesenfelt's infectious process and described tenderness to palpation of the lower back.

3

Dr. Salgado also opined that had Dr. Zachariah conformed with the standard of care, "the lumbar infection would have in all likelihood been detected earlier than it was" and "in all medical probability Ms. Liesenfelt would not have ultimately become gravely septic (as the lumbar abscess could have been drained or removed prior to sepsis deteriorating to the point of death)."

According to his CV, Dr. Salgado holds active medical licenses and is board certified in critical care, internal medicine, and pulmonary disease; he completed postgraduate programs in internal medicine in 2007 and critical care medicine in 2010; served on a Sepsis Committee from 2007 to 2008 at a medical center; and in 2008, he presented a lecture or workshop on "Severe Sepsis and Septic Shock - Updates in Management" with a "Focus on Improving Outcomes in the Hospitalized Patient" and a poster presentation "'Sepsis Guideline Implementation is influenced by physician specialty background,' Marilyn T. Haupt, MD Survey to determine differences in guideline adherence between Internal Medicine, Emergency Medicine and Critical Care Medicine physicians in care of septic patients."  His CV also confirms his experience as the chief fellow in critical care medicine at a medical center and as the chief medical resident for internal medicine at a separate medical center.

Appellants filed objections to Dr. Salgado's report and a motion to dismiss. Appellants challenged Dr. Salgado's qualifications to opine on causation and the standard of care for a family care physician and contended that his opinions on causation and the standard of care were deficient because they were vague and conclusory.  Following a hearing, the trial court signed an order, sustaining one or more of appellants' objections and granting Durtschi a 30-day extension to cure the deficiency or deficiencies in the expert report.  *See id.* § 74.351(c) (authorizing court to grant one 30-day extension to cure deficiency in expert report).  Durtschi timely served appellants with an amended report, and appellants filed objections to the amended

4

report and a second motion to dismiss, generally claiming that the amended report was deficient on the same grounds that they raised as to the initial report. Durtschi filed a response and, following a hearing, the trial court signed an order overruling appellants' objections to the amended report and denying their motion to dismiss. This interlocutory appeal followed.

## ANALYSIS

**Chapter 74 Expert Report Requirements and Standard of Review**

Section 74.351 of the TMLA provides a 120-day window for a claimant who is asserting a health care liability claim to serve each defendant physician and health care provider with an expert report and the expert's CV. *See id.* § 74.351(a). "The purpose of the expert report requirement is to deter frivolous claims, not to dispose of claims regardless of their merits." *Scoresby v. Santillan*, 346 S.W.3d 546, 554 (Tex. 2011). Two functions of the expert report are to "inform the defendant of the specific conduct the plaintiff has called into question" and "provide a basis for the trial court to conclude that the claims have merit." *Certified EMS, Inc. v. Potts*, 392 S.W.3d 625, 630 (Tex. 2013) (quoting *American Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 879 (Tex. 2001)); *see Baty v. Futrell*, 543 S.W.3d 689, 693–93 (Tex. 2018) (describing "*Palacios* framework" for reviewing expert report's adequacy).

A trial court should not grant a motion challenging the adequacy of an expert report unless "it appears to the court, after hearing, that the report does not represent an objective good faith effort to comply with the definition of an expert report in Subsection (r)(6)." Tex. Civ. Prac. & Rem. Code § 74.351(*l*); *see id.* § 74.351(r)(6). "A valid expert report has three elements: it must fairly summarize the applicable standard of care; it must explain how a physician or health care provider failed to meet that standard; and it must establish the causal

5

relationship between the failure and the harm alleged." *Potts*, 392 S.W.3d at 630 (citing Tex. Civ. Prac. & Rem. Code § 74.351(r)(6)). "A report that satisfies these requirements, even if as to one theory only, entitles the claimant to proceed with a suit against the physician or health care provider." *Id.*; *see Scoresby*, 346 S.W.3d at 549 (holding that "document qualifies as an expert report if it contains a statement of opinion by an individual with expertise indicating that the claim asserted by the plaintiff against the defendant has merit"). In making its evaluation, "[t]he trial court should look no further than the report itself, because all the information relevant to the inquiry is contained within the document's four corners." *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002) (citing *Palacios*, 46 S.W.3d at 878); *see Baty*, 543 S.W.3d at 693 (confirming that "report's adequacy does not depend on the use of any particular 'magic words,' so long as it contains sufficient information 'within the document's four corners' to fulfill *Palacios*'s two-part mandate" (quoting *Bowie Mem'l Hosp.*, 79 S.W.3d at 52–53)).

We review a trial court's denial of a section 74.351 motion to dismiss for an abuse of discretion. *Abshire v. Christus Health Se. Tex.*, 563 S.W.3d 219, 223 (Tex. 2018) (per curiam); *TTHR Ltd. P'ship v. Moreno*, 401 S.W.3d 41, 44 (Tex. 2013); *Palacios*, 46 S.W.3d at 875. "Under that standard, appellate courts defer to the trial court's factual determinations if they are supported by evidence, but review its legal determinations de novo." *Van Ness v. ETMC First Physicians*, 461 S.W.3d 140, 142 (Tex. 2015). "A trial court abuses its discretion if it rules without reference to guiding rules or principles." *Id.*; *see Hebert v. Hopkins*, 395 S.W.3d 884, 891 (Tex. App.—Austin 2013, no pet.) (explaining that courts of appeal do not examine content of expert report and make own de novo determination as to whether expert provided sufficient information but determine whether trial court acted arbitrarily, unreasonably,

and without reference to guiding rules and principles in its determination about expert report's adequacy). With these standards in mind, we turn to appellants' issues.

**Did the trial court abuse its discretion in denying appellants' motion to dismiss?**

In their first issue, appellants argue that the trial court abused its discretion in denying their motion to dismiss because Dr. Salgado's expert report did not constitute a good faith effort to comply with the TMLA's expert report requirements. In four sub-issues, appellants challenge the adequacy of the report as to causation and standard of care and Dr. Salgado's qualifications to render an expert opinion on causation and standard of care.

*Causation*

In their first sub-issue, appellants argue that the trial court abused its discretion by impliedly finding that Dr. Salgado's expert report provided an adequate summary of the causal relationship between Dr. Zachariah's purported negligence and Liesenfelt's injuries and death.

"[C]ausation is established by proof that the negligent act or omission was a substantial factor in bringing about the harm and without which the harm would not have occurred." *Costello v. Christus Santa Rosa Health Care Corp.*, 141 S.W.3d 245, 249 (Tex. App.—San Antonio 2004, no pet.). In the context of the TMLA's expert report requirement, the element of causation "requires that the expert explain 'how and why' the alleged negligence caused the injury in question." *Abshire*, 563 S.W.3d at 224 (citing *Jelinek v. Casas*, 328 S.W.3d 526, 536 (Tex. 2010)). "A conclusory statement of causation is inadequate; instead, the expert must explain the basis of his statements and link conclusions to specific facts." *Id.* (citing *Jelinek*, 328 S.W.3d at 539); *see Columbia Valley Healthcare Sys., L.P. v. Zamarripa*, 526 S.W.3d 453, 461 (Tex. 2017) ("[W]ithout factual explanations, the reports are nothing more

7

than the *ipse dixit* of the experts, which . . . are clearly insufficient."). "In satisfying this 'how and why' requirement, the expert need not prove the entire case or account for every known fact; the report is sufficient if it makes 'a good-faith effort to explain, factually, how proximate cause is going to be proven.'" *Abshire*, 563 S.W.3d at 224 (quoting *Zamarripa*, 526 S.W.3d at 460); *see Zamarripa*, 526 S.W.3d at 460 (describing proximate cause's two components of foreseeability and cause-in-fact). "[W]ith respect to causation, the court's role is to determine whether the expert has explained how the negligent conduct caused the injury." *Abshire*, 563 S.W.3d at 226. "Whether this explanation is believable should be litigated at a later stage of the proceeding." *Id.*; *see Miller v. v. JSC Lake Highlands Operations, L.P.*, 536 S.W.3d 510, 516–17 (Tex. 2017) (per curiam) ("We remain mindful that an 'adequate' expert report 'does not have to meet the same requirements as the evidence offered in a summary-judgment proceeding or at trial.'" (quoting *Scoresby*, 346 S.W.3d at 556 n. 60 (quoting *Palacios*, 46 S.W.3d at 879))).

In his amended report, Dr. Salgado opined that Dr. Zachariah's breaches of the standard of care—failing to order radiology testing on the lumbar spine and follow-up after the abscess removal—caused Liesenfelt's death:

> The standard of care requiring a family physician to order x-rays or other radiological treatment for patients displaying tenderness on palpation to the back is to reveal the presence of any bony or soft tissue abnormalities. This is particularly important with knowledge of infectious process like the abscess Dr. Zachariah removed from Ms. Liesenfelt's shoulder on June 20, 2018. The abscess is an infectious process. Dr. Zachariah should have scheduled a prompt follow-up following that June 20, 2018 procedure. If Dr. Zachariah had ordered a prompt follow-up visit, Ms. Liesenfelt's continued back pain should have prompted radiological testing to ensure the infectious process (the abscess) had not disseminated to the lumbar spine (which was the location of the infection which ultimately led to her death). Further, Dr. Zachariah should have ordered radiological testing on the 7/23/18 visit. Had Dr. Zachariah conformed with these standards of care by ordering radiological testing along with the 6/20/18 abscess removal, recommending an immediate follow-up, or ordering radiological testing

8

on the 7/23/18 visit, the lumbar infection would have in all likelihood been detected earlier than it was. Had the lumbar infection been detected earlier, as it probably would have if Dr. Zachariah had complied with the applicable standards of care, in all medical probability Ms. Liesenfelt would not have ultimately become gravely septic (as the lumbar abscess could have been drained or removed prior to sepsis deteriorating to the point of death).

The fact that Ms. Liesenfelt tested positive for both MRSA and MSSA infections does not change the causation result outlined above. MRSA stands for methicillin-resistant staphylococcus aureus. MSSA stands for methicillin-sensitive staphylococcus aureus. Both are the same primary type of bacteria: staphylococcus. An MSSA infection like the initial positive test for Ms. Liesenfelt can and does morph into MRSA as it evolves. In this case, in all medical probability, the initial MSSA positive result and the later MRSA positive result can and (without any contrary findings in the records, nor diagnostic testing to review) probably did share the same origin. That is, in all likelihood the bacteria manifesting in Ms. Liesenfelt's shoulder abscess that Dr. Zachariah removed had disseminated into her lower spine, morphing from MSSA to MRSA at the time of her death.

In summary, Ms. Liesenfelt unfortunately succumbed to multisystem organ failure as a result of septic shock from an epidural abscess which should have been suspected after the June shoulder abscess removal and July's clinical visit with Dr. Zachariah in the setting of prior soft tissue infection and physical findings of localized tenderness.

Appellants argue that Dr. Salgado's "causation opinion is completely conclusory and impermissible *ipse dixit*"; that his opinion is internally inconsistent as to foreseeability and cause-in-fact; that he needed to explain "how a staphylococcus infection can disseminate generally from the surface of skin to a distant location within the spinal canal or specifically did so in Liesenfelt's case"; that the report was "devoid of any facts to demonstrate that 'morphing' or 'dissemination" [into MRSA] was foreseeable in this patient by Dr. Zachariah"; and, relying on Durtschi's pleaded facts, that Dr. Salgado failed "to demonstrate cause-in-fact, as he does not explain how and why this evolution and dissemination occurred despite removal of the shoulder abscess, treatment with antibiotics by Dr. Zachariah, a 2-day hospital admission and workup for worsening of the same symptoms just days after Dr. Zachariah's last treatment, confirmation that

9

any staph infection was 'gone' at the end of that hospitalization, and an additional ten days of 'strong' out-patient antibiotic therapy after discharge from the hospital."[4] Appellants contend that Dr. Salgado's "causation opinion is not about sepsis" but "an antibiotic-resistant epidural abscess purportedly caused by a remote, superficial skin infection, treatable and treated with antibiotics"; that there were other possibilities for the origin of the infection of the spine; and that Dr. Salgado's report was required to explain "with medically verifiable evidence to a reasonable degree of medical probability" why his inferences and opinions drawn from those inferences "are medically preferable to competing inferences equally consistent with the known facts." Appellants also fault Dr. Salgado for not citing "any literature or source" to support his opinions that "[a]n MSSA infection like the initial positive test for Ms. Liesenfelt can and does morph into MRSA as it evolves" and that "an epidural abscess should have been suspected . . . in the setting of prior soft tissue infection and physical findings of local tenderness."

Dr. Salgado's amended report, however, specifically addressed MRSA and MSSA, explaining that they are the same type of bacteria, staphylococcus, and nothing in the statutory language requires an expert to provide more than a "fair summary of the expert's opinions," such as requiring the expert to cite literature or some other objective source to support his opinions on causation. *See* Tex. Civ. Prac. & Rem. Code § 74.351(r)(6) (defining "expert report" to be written report providing "fair summary of the expert's opinions"); *Abshire*, 563 S.W.3d at 226 (explaining that court's role is to determine whether expert has explained how

---

[4] We disagree with appellants' characterization of Durtschi's pleaded facts, specifically that Durtschi pleaded that the infection was gone after Liesenfelt's hospital stay when her gallbladder was removed. Durtschi pleaded that when asked if the staph infection was gone following the surgery to remove Liesenfelt's gallbladder, a subsequent health care provider "specifically replied: 'yes, but we're going to keep her on strong antibiotics for 10 days.'" In other words, Durtschi pleaded that a subsequent health care provider told Durtschi that the infection was gone, not that it was actually gone.

negligent conduct caused injury; whether explanation is believable is litigated at later stage of proceeding); *see also New Med. Horizons, II, Ltd. v. Milner*, 575 S.W.3d 53, 70 (Tex. App.—Houston [1st Dist.] 2019, no pet.) (concluding that causation opinion provided "how and why" and a "straightforward link" between alleged breach of standard of care and injury); *Kelly v. Rendon*, 255 S.W.3d 665, 677 & n.6, 699 (Tex. App.—Houston [14th Dist.] 2008, no pet.) (explaining that court was not persuaded that section 74.351 requires "type of extreme detail" endorsed by health care provider and "keeping in mind that expert reports . . . are simply a preliminary method to show a plaintiff has a viable cause of action that is not frivolous or without expert support").

Appellants also focus on the weeks between Dr. Zachariah's treatment and Liesenfelt's death, including Liesenfelt's hospital stay during this time period, to argue that "the report does not draw a line directly between an injury remote in time from the alleged negligence." *See Abshire*, 563 S.W.3d at 225 (requiring report to adequately explain "links in the causal chain"); *Greenville SNF, LLC v. Webster*, No. 05-18-00038-CV, 2018 Tex. App. LEXIS 10760, at *7 (Tex. App.—Dallas Dec. 21, 2018, no pet.) (mem. op.) ("An expert may show causation by explaining a chain of events that begins with [the defendant's] negligence and ends in injury to the plaintiff."). The alleged injury at issue, however, was not remote in time from Dr. Zachariah's care. Dr. Salgado's opinion was that the infection remained and continued to worsen after Dr. Zachariah's alleged negligent care. And "[n]othing in section 74.351 suggests the preliminary report is required to rule out every possible cause of the injury, harm, or damages claimed, especially given that section 74.351(s) limits discovery before a medical expert's report is filed." *Webster*, 2018 Tex. App. LEXIS 10760, at *20 (citation omitted).

11

"[T]he report need not explain how every causal link connects," "explain the mechanism of injury," or provide "an exhaustive explanation of the underlying medical details." *Wheeler v. Luberger*, No. 14-14-00992-CV, 2016 Tex. App. LEXIS 263, at *17 (Tex. App.—Houston [14th Dist.] 2016, no pet.) (mem. op.); *see Puppala v. Perry*, 564 S.W.3d 190, 201 (Tex. App.—Houston [1st Dist.] 2018, no pet.) (rejecting argument that "the experts' opinions are conclusory because they fail to identify when Perry's abscess had grown and damaged his spinal cord to the point that his paralysis was irreversible and they fail to compare the timing of that event to when an MRI could have been obtained had Puppala not breached the applicable standard of care" and observing that "absence of an opinion stating with specificity at what point in the continuum of disease progression an intervention would have proven timely does not cause these experts' causation opinion to be conclusory at this early stage of evaluation").

Based on its review of the entire report, the trial court within its discretion could have concluded that Dr. Salgado adequately explained the causal chain from Dr. Zachariah's alleged negligent care to Liesenfelt's death by drawing a direct line from Dr. Zachariah's breaches of the standard of care, including not ordering radiological testing on the lumbar spine "to ensure the infectious process (the abscess) had not disseminated to the lumbar spine (which was the location of the infection which ultimately led to her death)," to her death ("[h]ad the lumbar infection been detected earlier, as it probably would have if Dr. Zachariah had complied with the applicable standards of care, in all medical probability Ms. Liesenfelt would not have ultimately become gravely septic (as the lumbar abscess could have been drained or removed prior to sepsis deteriorating to the point of death)"). *See Abshire*, 563 S.W.3d at 225–26 (disagreeing that analytic gap existed in expert report and explaining that report adequately

12

linked conclusion with underlying facts, that "failure to properly document Abshire's medical history was a substantial factor in her delayed treatment and subsequent injury").

We conclude that the trial court within its discretion could have concluded that Dr. Salgado's causation opinions were sufficient. *See id.*; *see also Potts*, 392 S.W.3d at 630–31 (recognizing that "expert report does not require litigation-ready evidence" and noting that functions of expert report are to "inform the defendant of the specific conduct the plaintiff has called into question" and "provide a basis for the trial court to conclude that the claims have merit"); *Christian Care Ctrs., Inc. v. Golenko*, 328 S.W.3d 637, 648 (Tex. App.—Dallas 2010, pet. denied) (concluding that expert report sufficiently "articulated the required causal relationship" between alleged failure to meet applicable standards of care and plaintiff's death); *UHS of Timberlawn, Inc. v. S.B.*, 281 S.W.3d 207, 213–15 (Tex. App.—Dallas 2009, pet. denied) (concluding that expert report sufficiently linked health care provider's negligence with alleged harm or injuries to provide sufficient basis for trial court to conclude that claim had merit and that trial court did not abuse discretion in denying motion to dismiss); *cf. Columbia N. Hills Hosp., Subsidiary, L.P. v. Tucker*, No. 05-14-00056-CV, 2014 Tex. App. LEXIS 13685, at *6 (Tex. App.—Dallas Dec. 22, 2014, no pet.) (mem. op.) (reviewing causation opinion "in the context of the entire report when assessing its sufficiency" and observing that expert was not required to rule out all possible causes of claimant's injuries but concluding that expert report was inadequate on element of causation).[5]

---

[5] As support for their position that Dr. Salgado's expert report was insufficient as to causation, appellants rely on *Karkoutly v. Guerrero*, No. 13-17-00097-CV, 2017 Tex. App. LEXIS 11604 (Tex. App.—Corpus Christi-Edinburgh Dec. 14, 2017, no pet.) (mem. op.), but in that case, the expert report itself "discussed three potential sources of [the patient's] infection" and contained significant omissions concerning the exploratory surgery that the defendant physician was allegedly negligent by not promptly recommending, *id.* at *9. In contrast,

*Standard of Care*

In their second sub-issue, appellants argue that the trial court abused its discretion by impliedly finding that Dr. Salgado's expert report identified and adequately summarized the applicable standard of care for Dr. Zachariah and the manner in which he breached that standard of care. Appellants contend that the report failed to inform Dr. Zachariah "of the specific conduct called into question" and "provide[d] internally inconsistent opinions about the appropriate actions of a physician in the setting of a prior staph infection and findings of localized back tenderness."

"To adequately identify the standard of care, an expert report must set forth 'specific information about what the defendant should have done differently.'" *Abshire*, 563 S.W.3d at 226 (quoting *Palacios*, 46 S.W.3d at 880). "While the Act requires only a 'fair summary' of the standard of care and how it was breached, 'even a fair summary must set out what care was expected, but not given.'" *Id.* (quotation omitted). At the preliminary stage of the TMLA's expert report requirement, however, whether the articulated "standards appear reasonable is not relevant to the analysis." *Id.* (quoting *Miller*, 536 S.W.3d at 516–17).

In addition to the portion of the amended report quoted above, Dr. Salgado opined about the applicable standards of care for a family physician like Dr. Zachariah and his breaches of the standards of care, including opining:

---

Dr. Salgado's report did not discuss alternative sources of the infection, and his opinion on causation is consistent with the epidural abscess that was found through subsequent radiological testing. *Cf. Jelinek v. Casas*, 328 S.W.3d 526, 536–37 (Tex. 2010) (in context of jury trial, concluding that causation evidence was insufficient because expert's conclusion that undetected infection was present was undermined by concession that symptoms were consistent with infections not treatable by certain medicines and explaining that it was equally plausible that patient had infection or did not).

14

The standard of care applicable to a family physician like Dr. Zachariah, on presentment of Ms. Liesenfelt's symptoms including tenderness to the lower back, should have been to order a lumbar spine x-ray to identify the potential cause(s) of the spinal tenderness, for the purpose of identifying bone infection that can develop into an abscess down the line. An x-ray could rule out bone findings consistent with bone infection, which is an initial indication of an abscess. If the x-ray is abnormal as listed in the previous sentence, or if the symptoms of lower back pain continued in spite of a normal x-ray and with knowledge of the recent superficial skin infection (the abscess Dr. Zachariah removed on 6/20/18 was an infection), an MRI of the lumbar spine should have been ordered. The MRI can more definitively demonstrate the presence of an abscess in the lumbar spine (the location of Ms. Liesenfelt's pain), which would be an ongoing infection.

Further, given the abscess removed from Ms. Liesenfelt's shoulder on 6/20/18, the standard of care applicable to Dr. Zachariah required him to schedule [a] follow-up appointment no later than two weeks later to ensure there was no dissemination of the infection.

* * *

Therefore, Dr. Zachariah breached the standards of care identified above by not ordering any radiological testing concurrently with his 6/20/18 abscess removal (neither an initial x-ray nor a subsequent MRI as the standard of care outlined above demanded), by not insisting on a prompt follow-up following the 6/20/18 abscess removal (there was no follow-up appointment scheduled, let alone one within two weeks as the standard of care demanded), and by not ordering any radiological testing following the 7/23/18 visit despite his knowledge of Ms. Liesenfelt's infectious process and described tenderness to palpation of the lower back.

Appellants characterize Dr. Salgado's report as containing opinions on the required standards of care that are contradictory and internally inconsistent, thereby prohibiting the trial court from concluding that Durtschi's negligence claims have merit. Referencing Dr. Salgado's comments about other health care providers in the report, appellants question why the subsequent providers' standard of care would not have required the radiology testing and follow-up that Dr. Salgado opined was the applicable standard of care for Dr. Zachariah. For example, appellants contend that Dr. Salgado's comments in the section summarizing medical events about a "very uneventful" hospital stay at the end of July espoused his opinion that the

15

subsequent health care providers "presumably met the standard of care" but there was "no indication that the patient was instructed to follow up" from the hospital stay. Based on the presumption that Dr. Salgado believed that the subsequent health care providers met the standards of care, appellants argue that Dr. Salgado's statements in his report about their care were inconsistent with his opinion that Dr. Zachariah was negligent.

Dr. Salgado, however, did not address the applicable standards of care for the subsequent health care providers, and our review of the adequacy of his opinions as to the applicable standard of care for Dr. Zachariah is limited to the four corners of the report. *See Baty*, 543 S.W.3d at 693; *Wright*, 79 S.W.3d at 52. Dr. Salgado opined that given Liesenfelt's presentment and diagnosis, Dr. Zachariah should have ordered a lumbar spine x-ray or MRI and scheduled a follow-up visit within two weeks to ensure there was not dissemination of the infection. He explained that the reason for ordering a lumbar spine x-ray was "to reveal the presence of any bony or soft tissue abnormalities" and that the x-ray could have identified the "potential cause(s) of the spinal tenderness, for the purpose of identifying bone infection that can develop into an abscess down the line." And he provided underlying facts, including that "[t]he abscess is an infectious process" and that Liesenfelt "was seen by the same physician (Dr. Zachariah) whom had suspected and treated severe infectious processes to her back and shoulder and hence had the luxury of having not just access to records (as it was the same clinic), but first-hand knowledge of Ms. Liesenfelt's health background and therapies."

16

At this preliminary stage, the trial court within its discretion could have found that the report was sufficient as to the applicable standards of care for Dr. Zachariah and his alleged breaches of those standards.[6] *See Abshire*, 563 S.W.3d at 226.

*Qualification*

In their third and fourth sub-issues, appellants argue that the trial court abused its discretion by impliedly finding that Dr. Salgado was qualified to render an opinion on the standard of care for Dr. Zachariah, "an outpatient-clinic-based family practice physician," and on the causal connection between Dr. Zachariah's treatment and Liesenfelt's injuries and death "from an epidural abscess caused by [MRSA]."

To be qualified as an expert in a suit against a physician on the applicable standard of care, the expert physician must be practicing medicine at the time the testimony is given, have knowledge of the accepted standards of medical care, and be qualified based on training or experience. *See* Tex. Civ. Prac. & Rem. Code §§ 74.351(r)(5)(A), .401(a); *Collini v. Pustejovsky*, 280 S.W.3d 456, 462 (Tex. App.—Fort Worth 2009, no pet.) ("An expert report concerning standards of care for physicians 'authored by a person who is not qualified to testify . . . cannot constitute an adequate report.'" (quoting *In re Windisch*, 138 S.W.3d 507, 511 (Tex. App.—Amarillo 2004, no pet.)). In determining whether a physician is qualified based on his

---

[6] We find appellants' cited authorities addressing internal inconsistencies within expert reports to be factually distinguishable. *See, e.g.*, *Hebert v. Hopkins*, 395 S.W.3d 884, 894 (Tex. App.—Austin 2013, no pet.) (considering whether trial court abused its discretion in granting motion to dismiss and addressing expert's "recognition of an apparent exception, qualification, or limitation to his broader criticisms of anterior fixation"); *Fung v. Fischer*, 365 S.W.3d 507, 531 (Tex. App.—Austin 2012, no pet.) (noting that inconsistency concerned physician's actual knowledge of condition at issue and that "report affirmatively negates Fung's having seen the information that is key to his liability"), *overruled in part on other grounds by Certified EMS, Inc. v. Potts*, 392 S.W.3d 625, 630 (Tex. 2013).

17

training and experience, the trial court considers if he is board certified or has other substantial training or experience in an area of medical practice relevant to the claim and "is actively practicing medicine in rendering medical care services relevant to the claim." Tex. Civ. Prac. & Rem. Code § 74.401(c); *Armenta v. Jones*, No. 01-17-00439-CV, 2018 Tex. App. LEXIS 1586, at *7–8 (Tex. App.—Houston [1st Dist.] Mar. 1, 2018, no pet.) (mem. op.). The focus in determining if an expert is qualified "is on the fit between the subject matter at issue and the expert's familiarity therewith, and not on a comparison of the expert's title or specialty with that of the defendant." *McKowen v. Ragston*, 263 S.W.3d 157, 164 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (citation and internal quotations omitted).

In his amended report, Dr. Salgado listed his certifications and areas of practice, stated that his opinions were based on his "education, publications, research, presentations, and medical experience" as outlined in his CV, and further addressed his qualifications as follows:

> Based on my education, training, experience, and current practice, as more fully outlined in my CV, I have knowledge of and am qualified to opine on the standards of care applicable to family physicians performing procedures like Aveen Zachariah in this case. Based on my education, training, experience, and current practice, as more fully outlined in my CV, I have knowledge of and am qualified to opine on the causal connection between breaches of standards of care by family physicians performing procedures like Aveen Zachariah in this case and the injuries and ultimate death like that suffered by Doris Liesenfelt in this case. My conclusions have been drawn to a reasonable degree of medical certainty and probability from the standpoint of a qualified physician who treats patients with similar pathologies.

Dr. Salgado's CV reflects that he is board certified in internal and critical care medicine and that he has knowledge of and experience with sepsis.

Appellants assert that Dr. Salgado, "a lung transplant physician working in a hospital setting," is unqualified to opine about the standard of care of "a family physician in a

clinical setting," "for the evaluation and treatment of back pain and a superficial shoulder abscess caused by methicillin-sensitive staphylococcus aureus." Appellants rely on the following omissions in the expert report and CV: (i) "[t]he report and CV do not state that Dr. Salgado has ever evaluated or treated back pain or a shoulder abscess in any setting, let alone an office-based walk-in clinic"; (ii) the phrase "family practice" does not appear on his CV; and (iii) he is not board certified and has not completed training specific to family medicine. They also argue that Dr. Salgado's experience with sepsis was 10 years prior to Dr. Zachariah's care and that the expert report and CV do not specifically address Dr. Salgado's knowledge, training, or experience with "skin abscesses, bony spinal infections, epidural abscesses, or staph infections."

To be qualified to opine on the standard of care, however, an expert does not have to be a specialist in the same practice area as the defendant physician. *See McKowen*, 263 S.W.3d at 165–66. Dr. Salgado is board certified in critical care and internal medicine, a substantially similar branch of medicine to family practice medicine for the treatment of adults,[7] and the subject matters at issue primarily involve an "infectious process" and sepsis, both of which Dr. Salgado has experience and familiarity. *See id.* at 164; *see also Armenta*, 2018 Tex. App. LEXIS 1586, at *11–12 (concluding that anesthesiologist was qualified to testify against plastic surgeon about standard of care "regarding matters common to and equally recognized and developed in all fields of practice"); *Khan v. Ramsey*, No. 01-12-00169-CV,

---

[7] In his response to appellants' motion to dismiss, Durtschi provided the trial court with general information from the American College of Physicians that showed that family practice and internal medicine are substantially similar. Internal medicine practitioners treat only adults, and family medicine practitioners treat adults and children, but internal medicine and family practice physicians function as primary care physicians. *See* https://www.acponline.org/about-acp/about-internal-medicine/career-paths/medical-student-career-path/internal-medicine-vs-family-medicine (last visited May 10, 2022).

19

2013 Tex. App. LEXIS 2981, at \*14–16 (Tex. App.—Houston [1st Dist.] Mar. 21, 2013, no pet.) (mem. op.) (concluding that expert who was family practice physician was qualified to testify against internal medicine specialist; that "if the subject matter is common to and equally recognized and developed in all fields of practice, any physician familiar with the subject may testify as to the standard of care"; and that prevention of infection is common and equally recognized and developed in all fields of practice (citing *Keo v. Vu*, 76 S.W.3d 725, 732 (Tex. App.—Houston [1st Dist.] 2002, pet denied)); *Garza v. Keillor*, 623 S.W.2d 669, 671 (Tex. App.—Houston [1st Dist.] 1981, writ ref'd n.r.e.) (concluding that trial court did not abuse discretion in permitting internal medicine practitioner to testify as expert against defendant orthopedic surgeons about standard of care in "infection process"); *cf. Wigley v. Shannon Med. Ctr.*, No. 03-17-00086-CV, 2017 Tex. App. LEXIS 11177, at \*12–13 (Tex. App.—Austin Dec. 1, 2017, no pet.) (mem. op.) (concluding that trial court did not err in granting summary judgment where expert physician, who was internal medicine practitioner and generally familiar with pressure ulcers, did not show that he was qualified to testify concerning particular subject at issue, pressure ulcers that developed on trauma and ICU patient at hospital).

Appellants also assert that Dr. Salgado is not qualified "to render an expert opinion about the causal connection between Dr. Zachariah's treatment and Liesenfelt's injuries and death from an epidural abscess caused by methicillin-resistant staphylococcus aureus." To be qualified to testify as an expert on causation, the physician must be "otherwise qualified to render opinions on that causal relationship under the Texas Rules of Evidence." Tex. Civ. Prac. & Rem. Code § 74.351(r)(5)(C); *see id.* § 74.403(a) (addressing qualification of expert witness on causation in health care liability claim against physician or health care provider). The Rules of Evidence require an expert to have "knowledge, skill, experience, training, or education"

20

regarding the specific fact at issue. Tex. R. Evid. 702; *see Cornejo v. Hilgers*, 446 S.W.3d 113, 121 (Tex. App.—Houston [1st Dist.] 2014, pet. denied) (explaining that "plaintiff must show that her expert has 'knowledge, skill, experience, training, or education' regarding the specific issue before the court that would qualify the expert to give an opinion on that particular subject" (quoting *Broders v. Heise*, 924 S.W.2d 148, 153–54 (Tex. 1996))).

Appellants argue that Dr. Salgado's causation opinions "necessarily require knowledge pertaining to infectious disease, orthopedics, epidural abscesses, radiology/neuroradiology, neurosurgery, and pathology" and that "[h]is CV and report do not demonstrate that he has knowledge, skill, experience, training, or education in any of these specific areas." An expert physician, however, is not required to have practiced in every medical discipline involved in the care of the patient, so long as he "has practical knowledge of what is usually and customarily done by other practitioners under circumstances similar to those confronting the malpractice defendant." *Keo*, 76 S.W.3d at 732. Further, "[w]hen a trial court finds for purposes of chapter 74 that a physician is qualified to give his expert opinion about the standard of care for a certain procedure, it is reasonable for the trial court to conclude that the physician is qualified to opine on the causal relationship between the failure to meet that standard and the resulting harm." *Legend Oaks-South San Antonio, LLC v. Molina*, No. 04-14-00289-CV, 2015 Tex. App. LEXIS 1524, *14 (Tex. App.—San Antonio Feb. 18, 2015, no pet.) (mem. op.) (citing *Whisenant v. Arnett*, 339 S.W.3d 920, 927 (Tex. App.—Dallas 2011, no pet.)).

Based on our review of Dr. Salgado's CV and report, we cannot conclude that the trial court abused its discretion in overruling appellants' objections to Dr. Salgado's qualifications to render an opinion on standard of care and causation. *See Whitmire v. Feathers*,

21

No. 01-19-00094-CV, 2020 Tex. App. LEXIS 6804, at *30 (Tex. App.—Houston [1st Dist.] Aug. 25, 2020, no pet.) (mem. op.) ("Whether an expert witness is qualified to offer an expert opinion lies within the sound discretion of the trial court." (citing *Cornejo*, 446 S.W.3d at 121)); *Molina*, 2015 Tex. App. LEXIS 1524, at *14 (concluding that trial court could reasonably have concluded that physician was qualified to state his opinion because his report demonstrated training, knowledge, and experience with issues involved in underlying claim).

### *Conclusion as to Trial Court's Implied Findings*

We hold that the trial court acted within its discretion when it impliedly found that Dr. Salgado was qualified and that his report represents a good faith effort to provide a fair summary of his opinions regarding the applicable standards of care, Dr. Zachariah's failure to meet those standards, and the causal relationship between the failure and the harm claimed. *See* Tex. Civ. Prac. & Rem. Code § 74.351(*l*), (r)(6). The report sufficiently links Dr. Salgado's conclusions to the facts, gives appellants fair notice of the complaints against them, and is sufficient to have permitted the trial court to conclude that there is merit to one or more of the claims. *See Abshire*, 563 S.W.3d at 224; *Potts*, 392 S.W.3d at 630. We overrule appellants' first issue.

## Attorney's Fees and Costs

Because we have concluded that the trial court did not abuse its discretion in overruling appellants' objection to Dr. Salgado's amended expert report and in denying their motion to dismiss, we also conclude that the trial court did not abuse its discretion in denying their request for an award of attorney's fees and costs. *See* Tex. Civ. Prac. & Rem. Code § 74.351(b)(1) (requiring trial court to award attorney's fees and costs to defendant physician or

22

health care provider when expert report is not served within statutory deadline).  We overrule their second issue.

## CONCLUSION

Having overruled appellants' issues, we affirm the trial court's order overruling their objections to Dr. Salgado's expert report and denying their motion to dismiss.

_____

Melissa Goodwin, Justice

Before Justices Goodwin, Triana, and Smith

Affirmed

Filed:  May 13, 2022

23